CHARLES HALPERIN, Plaintiff, *v.* THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, Defendant.

Municipal Court of New York, Borough of Manhattan, First District, June 30, 1925.

Insurance — disability annuity — action by insured to recover disability under clauses in two policies of life insurance reciting that if the insured becomes wholly and permanently disabled before age 60, defendant would waive subsequent premiums and pay annuity monthly — disability deemed total under clause in policy where it prevents insured from engaging in " any occupation or performing any work for compensation of financial value " — insured suffering from progressive type of Buerger's disease — treatment accorded insured necessitates his remaining at home, off his feet — insured totally disabled within provisions of policy by reason of said disease — insured not required in face of acute condition to engage in occupation.

Plaintiff, in an action upon two policies of life insurance, issued by the defendant, to recover the disability annuity provided therein, under the provisions of said policies providing that if the insured becomes wholly and permanently disabled before the age of sixty, said defendant will waive subsequent premiums and pay to the insured a designated annuity monthly, is entitled to recover the amount demanded, where it appears that disability under said policies " shall be deemed to be total when it is of such an extent that the insured is prevented thereby from engaging in any occupation or performing any work for compensation of financial value; " that said insured is suffering from a progressive type of Buerger's disease by reason of which he has become totally and permanently disabled and so incapacitated that he is prevented from engaging in any occupation; and that the treatment being accorded the insured necessitates his remaining at home, off his feet.   The insured's condition, together with the treatment being accorded to him does not warrant that he should engage in any occupation.

In order to constitute total disability it is not necessary that he should be absolutely helpless.   It is sufficient if the injury or sickness is such that common care and prudence require him to desist from transacting business or work in order to effect a cure.

ACTIONS to recover the disability annuity provided in two policies of life insurance.

*Goldstein & Goldstein* [*Alexander Davis* of counsel], for the plaintiff.

*Alexander & Green* [*Peter C. Mann* and *James D. Ewing* of counsel], for the defendant.

GENUNG, J.:

Two actions are brought by the plaintiff to recover the disability annuity provided in two policies of life insurance, issued by the defendant, and payable in case of the total and permanent disability of the insured. The policy in action No. 1 provides:

" Total and Permanent Disability. " If the Insured becomes wholly and permanently disabled before age 60 the Society will waive subsequent premiums and pay to the Insured a DISABILITY-ANNUITY OF ONE HUNDRED FIFTY DOLLARS a month * * * by bodily injury or disease * * *.

" DISABILITY shall be deemed to be TOTAL when it is of such an extent that the Insured is prevented thereby from engaging in any occupation or performing any work for compensation of financial value, and such TOTAL DISABILITY shall be presumed to be PERMANENT when it is present and has existed continuously for not less than three months * * *."

The policy in action No. 2 contains a similar clause except that the amount of the disability annuity therein is $100 a month. Both of the policies are known as " ordinary life policies; " the policy involved in action No. 1 is for the face amount of $15,000, and the policy involved in action No. 2 is for the face amount of $10,000.

The plaintiff makes claim against the defendant in action No. 1 for $450 for three months' installments which he claims to be due at the time of the commencement of the action. The claim in action No. 2 is for $300 for a like period which plaintiff claims as installments due at the commencement of this action.

The complaint in each of the actions alleges *inter alia* that while the said policies were in full force and effect the plaintiff became wholly, totally and permanently disabled by disease as therein outlined and so incapacitated by said disease that he " is prevented thereby from engaging in any occupation or performing any work for compensation of financial value " and that said disability was present and had extended continuously for at least three months before the month of May, 1924, and further alleges that he is still wholly, totally and permanently disabled due to the said disease referred to in the complaint.

The defendant admits the various preliminary steps necessary to be taken by the plaintiff in presenting his claim so that the only questions which remain to be decided are whether or not the plaintiff

Municipal Court of New York, June, 1925. [Vol. 125

was totally and permanently disabled so that he " is prevented from engaging in any occupation or performing any work for compensation of financial value," and whether or not the said disability was present and had existed continuously for at least three months before the commencement of the said actions.

The testimony elicited at the trial indicated that the plaintiff became afflicted with a disease known as Buerger's disease and that the symptoms dated back to about the month of November, 1923.

The plaintiff produced as a witness Dr. Buerger, who discovered what is known as Buerger's disease and to which diseases he gave the name of *thrombo angititis obliterans*, and which he testified was subsequently called by his name by others in the medical profession through this and other countries. He stated that this malady is an affection of the arteries and veins which leads to the closure of the arteries by the formation of clots and infects so large a territory of the arteries of the extremities that it leads to the impairment of function and very frequently gangrene of one or more extremities. He further testified that the plaintiff was afflicted with this disease known as Buerger's disease and that the disease was not a curable one from a standpoint of pathology, that it required constant care and attention and treatment at all times for the reason that this disease is a rapidly progressing one. He further said that the clots cannot be dissolved and that this condition impedes the use of his legs; further that he prescribed a treatment for the plaintiff which would keep the plaintiff occupied the greater part of the day by devoting his time to the treatment, and that such treatment should take about eight hours a day. As part of the treatment the exercises which were prescribed consist in elevating for a period of time both limbs to a position almost vertical, the patient lying on a bed, and then allowing the limbs to hang down for a short period over the edge of the bed, and then placing them in a horizontal position again. This exercise is repeated for a period of about an hour, then another period of baking treatment is instituted for a half hour or an hour, then a short period of rest in order to begin the exercise all over again.

Dr. Buerger testified that this repetition of exercises and baking would occupy most of the day. He stated that the baking process consists of a hot air apparatus which is allowed to heat the limbs. The treatment which was prescribed would also prevent the setting in of gangrene. The testimony also indicated that in carrying out this treatment the plaintiff is disabled during that period and that, if plaintiff attempted to occupy himself with anything other than the treatment and rest, it would undoubtedly interfere with

his condition and that to properly apply the treatment his mind should not be occupied with other pursuits, but should be concentrated on the treatment; otherwise his condition would undoubtedly get worse.

Dr. Buerger testified that he first attended the plaintiff on March 20, 1924, at which time he diagnosed the case as Buerger's disease and prescribed the treatment related herein and that he had attended the plaintiff many times since, as late as May 21, 1925, at which time he found that his condition was not improved.

Dr. Snyder, a witness produced by the defendant and in its employ, admitted that the treatment which was prescribed by Dr. Buerger was that which was prescribed by many other doctors. He also stated that Buerger's disease is a progressive one in that the disease increases rather than diminishes. He admitted that Dr. Buerger is recognized as a specialist with respect to this particular disease known as Buerger's disease and that he (Dr. Snyder) would diagnose the disease with which the plaintiff was afflicted as Buerger's disease, and that he so diagnosed it on July 11, 1924, when the witness examined the plaintiff. He further testified that he would prescribe a treatment similar to that suggested by Dr. Buerger, but in more moderation, and that the treatment in any event would depend upon the doctor and the patient. He also expressed the opinion that the treatment of Dr. Buerger is the best treatment for such disease up to the present time. He ventured the opinion that there is no better treatment than that prescribed by Dr. Buerger except possible amputation of the limbs, but that he would not recommend amputation until gangrene developed.

On cross-examination he admitted that he would recommend the type of treatment that Dr. Buerger prescribed in this particular case and that he respects Dr. Buerger's opinion as to the treatment prescribed. He also stated that he would not advise the plaintiff to abandon the treatment prescribed by Dr. Buerger and that such treatment required the plaintiff to lie flat on his back in bed. It was his professional opinion that if any walking or standing were done by the plaintiff the disease would become worse with the danger of gangrene and also with the danger of ulceration, resulting eventually in amputation as a possible means of saving the plaintiff's life.

The plaintiff testified that he followed the treatment of the doctor as far as he was able to do so, some days six hours and some days less, according to how he felt, as he claimed the treatment was very tiresome.

The plaintiff came to this country in 1886 as an immigrant

from Russia and worked for some years as a cigarmaker. Later he conducted a furniture store, from which he retired some years ago to enter the real estate business, consisting of the leasing of bungalows.

The defendant admits there is no question but what the plaintiff is partially disabled; that is, that his efficiency is impaired and it is more difficult for him to earn a livelihood, but claims that a careful examination of the policies and of the evidence will demonstrate that he is not totally disabled. The defendant suggests that the plaintiff could obtain employment as a cigarmaker, at which he could remain seated, and if on certain days he were required to work only part time, as such work is piece work, this would only lessen his productivity and not totally disable him. The defendant also suggests that the plaintiff between the exercises and baking applications and during the treatment as prescribed by Dr. Buerger, could engage himself in some other occupation and mentions among the illustrations a cashier in a restaurant during the evening dinner hour or an extra ticket seller at a moving picture theatre.

From a personal observation of the witnesses and particularly the plaintiff in the actions and from the testimony given at the trial, the court finds, as claimed by the plaintiff, that the plaintiff was totally and permanently disabled within the provisions of the policies, due to the disease as outlined, and that the plaintiff " is prevented thereby from engaging in any occupation or performing any work for compensation of financial value," and that such total disability was present and has existed continuously for at least three months before the commencement of the actions.

To uphold the defendant's contention that the plaintiff during the treatment as prescribed by Dr. Buerger could engage in any occupation would be inconsistent with the trend of authorities in this jurisdiction as well as others. (*Beach* v. *Supreme Tent*, 74 App. Div. 527; affd., 177 N. Y. 100; *Wolcott* v. *United, etc., Assn.*, 55 Hun, 98; *Davis* v. *Midland Casualty Co.*, 190 Ill. App. 338; *Great Eastern Casualty Co.* v. *Robins*, 111 Ark. 607; *Fidelity, etc., Co.* v. *Joiner*, [Tex. Civ. App.] 178 S. W. 806; *Brendon* v. *Traders, etc., Co.*, 84 App. Div. 530; *James* v. *U. S. Casualty Co.*, 113 Mo. App. 622; *Thayer* v. *Standard Life, etc., Ins. Co.*, 68 N. H. 577; *Monahan* v. *Order of Columbian Knights*, 88 Minn. 224.)

In the case of *Beach* v. *Supreme Tent* (*supra*), ADAMS, P. J., in the Appellate Division, stated: " * * * for it is somewhat difficult to conceive of a case where a party could be so severely injured as to be entirely disabled from directing the conduct of some kind of business. A brakeman on a railroad might lose both arms, and in consequence be unable to perform the kind of labor he had always

followed; but he could doubtless direct some one else to do it if permitted by his employer; and he might possibly earn a living as a track walker, provided he could obtain such employment; but in these circumstances would it be seriously contended that if he were a member of the defendant corporation, under a certificate similar to the one we are required to construe, the language of its contract should be so construed as to relieve it from all liability?

" Again, a farmer who has been so injured that he cannot hold a plow, or swing a scythe, or drive his horses, or milk his cows, might nevertheless hire some other person to perform these several duties, or he might direct how they should be performed, or he might leave his farm and find himself able to perform the duties of a flagman at a railroad crossing, and by so doing earn a livelihood, or at least sufficient to keep the wolf from the door; but would language which would admit of such a construction as is implied in this illustration be consistent with the purpose or intent of a benevolent, semi-charitable and fraternal organization? Manifestly not; and, we think, it would consequently be neither just nor reasonable to adopt such a construction in this particular instance.

" Assuming, therefore, that the defendant really intended to confer upon its members the benefits which its endowment system purports to confer, we are of the opinion that it would be much more consistent with such intent to so construe its contract as to hold that the language above quoted means simply that if a party whose occupation is that of directing others in the performance of their duty is so injured that he can no longer follow that occupation; or if any member shall be so far disabled as to be unfitted for the performance of his ordinary occupation or for following any other means of livelihood requiring substantially the same physical and mental ability as that in which he is usually engaged, he shall be deemed entitled to disability benefits. Such a construction would be just and reasonable, and it would not be unlike that given to similar language by the Court of Appeals in a recent case ( *Neill* v. *United Friends*, 149 N. Y. 430); while the construction contended for by the defendant would, in our opinion, operate unjustly and conflict with the present trend of authority. (*Spencer* v. *Grand Lodge*, 22 Misc. Rep. 147; affd., 53 App. Div. 627; *Deuble* v. *Grand Lodge*, 66 id. 323; *Langan* v. *American Legion of Honor*, 34 Misc. Rep. 629; 70 N. Y. Supp. 663.) "

In the case of *Davis* v. *Midland Casualty Co.* (*supra*) the court held that it was unnecessary to constitute " total disability " that the assured be helpless, and in *Fidelity, etc., Co.* v. *Joiner* (*supra*) the court said: " We agree it conclusively appeared, as claimed,

that the assured after he suffered the injuries performed duties pertaining to his occupation, but we do not agree that his doing so established as matter of law that he was not ' totally disabled ' within the meaning of those words as used in the policy. It not infrequently happens that one suffering from injuries to his person performs duties pertaining to his occupation which he is wholly unable, in the reasonable and proper sense of those words so used, to perform; and that, as a consequence, because he was unable to do same, he suffers death or an aggravation of his injuries. In a case in which such a result follows the performance of the duty, the performance thereof, instead of establishing that the assured was able to perform it, it seems to us, would establish the contrary."

Another striking example of the trend of authority is the case of *James* v. *U. S. Casualty Co.* (*supra*) where the court aptly states: " It cannot be that the parties intended that before an assured could recover on the policy he should lie the full period of his injury in a state of coma. To interpret the clause in its contractual sense, as defendant seeks to have us do, would render the contract utterly useless to an assured, and would be nothing short, practically speaking, of collecting a premium without rendering a consideration."

In *Thayer* v. *Standard Life, etc., Ins. Co.* (*supra*) the court stated: " As long as one is in full possession of his mental faculties, he is capable of transacting some parts of his business, whatever it may be, although he is incapable of physical action. If the words ' wholly disable him from transacting any and every kind of business pertaining to the occupation under which he is insured,' were to be construed literally, the defendants would be liable in no case unless, by the accident, the insured should lose his life or his reason.  *  *  * It is certain that neither party intended such a result. It cannot be said, as a matter of law, that the plaintiff's disability was not sufficient to entitle him to compensation under the terms of the policy."

The case of *Foglesong* v. *Modern Brotherhood* (121 Mo. App. 548) seems peculiarly applicable. In that case the court said: " But we are unwilling to adopt such a doctrine, the effect of which would be, practically, to reduce all such contracts to nullities and to make them the instruments of extracting dues from policyholders without creating any liability on the part of the insurers. Common knowledge of the occupations in the lives of men and women teach us that there is scarcely any kind of disability that prevents them from following some vocation or other, except in cases of complete mental inertia. We have examples of persons without hearing and without sight following a vocation — some without feet, and

some without hands, engaged in business.  The achievements of disabled persons are seemingly marvelous.  Under defendant's theory, the plaintiff might embark in the peanut trade or follow the business of selling shoe strings or lead pencils, or follow some similar calling, in which instances, under the rule invoked, there would be no disability within the meaning of the policy.  In our opinion, such was not within the contemplation of the parties.  In order to carry out the intent of the parties, it is our duty to disregard the broad language used which would have the effect to defeat the purpose of the contract and render it a nullity.  It has been said: ' The policy is the law by which the mutual rights and liabilities of the parties are to be measured, and should be construed strictly against the insurer, where they narrow the range and force of the allegation or provide for forfeiture.'  *  *  *  The language of the policy, ' permanent and total disability of said member, which renders him unable to carry on or conduct any vocation or calling,' the vocation of the insured not being designated, should be construed as meaning, if anything, the vocation or calling which he might be following at the time he became disabled and not any vocation whatever which he might be able to follow after he had been disabled.  *  *  *  We have seen to what absurd consequences a literal construction of the language would lead.''

To the same effect is *Wall* v. *Continental Casualty Co.* (111 Mo. App. 504).

The rule is well stated in Cooley's Briefs on Insurance (Vol. 4, p. 3289) wherein it is stated that '' In order to constitute total disability it is not necessary that the insured should be absolutely helpless.  He is so disabled if he is incapacitated for work or business, though he is able to leave his house, and even go to his physician's office.''  (*Mutual Benefit Assn.* v. *Nancarrow*, 18 Colo. App. 274; 71 Pac. 423.)  And further: '' *  *  *  but it is sufficient if the injury is such that common care and prudence require him to desist from transacting such business in order to effect a cure.''  (*Lobdill* v. *Laboring Men's Mutual Aid Assn.*, 69 Minn. 14; 71 N. W. 696; 38 L. R. A. 537; 65 Am. St. Rep. 542.)

Several instances are cited by the same author (Vol. 4, pp. 3291, 3292) on the question of total disability: that, if an insured is obliged to employ another to manage the business and can give personal attention to only a few of the details, devoting substantially all of the time to obtaining relief for his injury, his disability must be regarded as total ( *U. S. Casualty Co.* v. *Hanson*, 20 Colo. App. 393; 79 Pac. 176); and that, if the insured is able to perform the usual duties of his occupation but only with great pain and inconvenience, his disability must also be regarded as total (*Hohn* v. *Interstate*

*Casualty Co.*, 115 Mich. 79); and that, if the fact that one suffering from hernia might pursue an occupation by wearing a truss, this fact will not make such disability less a total one if the use of the truss would subject him to intolerable discomfort and endanger his life. (*McMahon* v. *Supreme Council, etc.*, 54 Mo. App. 468.)

From the facts presented and the findings made, in view of the foregoing decisions, it follows that the plaintiff is entitled to recover the amount demanded in each action. Judgments accordingly, with ten days' stay of execution.