34 N.J. Super. 556 (1955)
113 A.2d 28
PAULINE FANNICK, PLAINTIFF-APPELLANT,
v.
METROPOLITAN LIFE INSURANCE COMPANY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 28, 1955.
Decided March 23, 1955.
*557 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Robert C. Gruhin argued the cause for the appellant.
Mr. Nicholas Conover English argued the cause for the respondent (Messrs. McCarter, English & Studer, attorneys).
*558 The opinion of the court was delivered by FRANCIS, J.A.D.
An adverse verdict was returned by a jury on plaintiff's suit on an employer's group life insurance policy which she claimed covered her deceased husband. On this appeal she charges certain trial errors and that the verdict was against the weight of the evidence.
Defendant insurance company issued a group life insurance contract to the American Tobacco Company covering its employees. Decedent, John Fannick, husband of plaintiff, as an employee of the company at the Wilkes-Barre, Pennsylvania factory, was protected under it. His employment as general plant help began on March 13, 1946 and his last day of actual work there was June 28, 1951.
On July 2, 1951 the plant began the annual vacation and there is no dispute that Fannick shared in it. The house which he and his wife occupied had been sold and about this time they came to New Jersey and began to live with their two children in East Orange. The children had been living with the parents in Pennsylvania and had moved to this State four or five months earlier because their work opportunities were better here. Mr. and Mrs. Fannick never again resumed residence in Pennsylvania. Fannick died on October 25, 1951.
Section 5 of the policy provides that the insurance shall cease automatically on the date of termination of the employment. Termination is defined as cessation of active work as a regular full-time employee except in case of absence on account of sickness, injury or retirement, or leave of absence or temporary layoff. When the exceptions applied, the employment continued until terminated by the employer, but in the case of leave of absence or temporary layoff a limitation of two months was imposed. The contention was advanced at the trial that a leave of absence had been granted by the employer, but it is completely unsupported by proof.
When Fannick failed to return to work after the vacation period his employment was terminated by the Tobacco Company on July 30, 1951. However, plaintiff's position is that the insurance coverage continued until the death in October *559 under the total disability clause of the policy. Section III stipulates, among other things, that if the employee's death occurs within one year after the termination of his employment and satisfactory proof is submitted that he was "totally disabled uninterruptedly from the date of the termination of employment to the date of his death" and such proof is submitted within one year after the date of death, the benefits shall be paid.
An insured is defined to be totally disabled when "as a result of bodily injury or disease" he is "wholly prevented thereby from engaging in any and every business or occupation and from performing any work for compensation or profit. * * *."
Such language does not impose a requirement that an insured must be absolutely helpless in order to qualify as totally disabled. A person may be able to do some work for compensation in an endeavor for which he is trained or qualified and yet be totally disabled within the fair and reasonable intendment of the policy. Woodrow v. Travelers Insurance Co., 121 N.J.L. 170 (E. & A. 1938); Nickolopulos v. Equitable Life Assurance Society, 113 N.J.L. 450 (E. & A. 1934); Booth v. United States Fidelity & Guaranty Co., 3 N.J. Misc. 735 (Sup. Ct. 1925). It is generally said that to justify a recovery the disability must be such as renders an insured unable to perform all the substantial and material acts necessary to the prosecution of his business or occupation in a customary and usual manner. And performance of regular work for an inconsequential period of time under the circumstances of a particular case may not stand in the way of recovery of the insurance benefits. 29 Am. Jur., Insurance, § 1161, p. 872.
The specific issue to be determined is whether Fannick was totally disabled on July 30, 1951, the employment termination date, and whether that disability continued uninterruptedly until October 25, 1951, the date of death.
He worked regularly for the Tobacco Company in Pennsylvania. No proof was offered to show any medical treatment there. Evidence did appear that no doctor was called *560 for him in the spring of 1951 while he and his wife lived there. The son, who had previously emigrated to New Jersey, said that he drove to Wilkes-Barre on July 1, apparently to assist them in coming here. At this time he noticed that his father had lost weight and was eating poorly and had an unusual hoarseness in his voice. Later in East Orange in the same month he noticed blood on his father's bed sheet and his inquiry produced Fannick's comment that it was "probably a discharge." Thereafter there was continuous loss of weight and he noticed also a limitation in the movements of his father's neck.
Dr. William Deignan asserted that Fannick visited him around the middle of July 1951 complaining of pain in the throat, stiffness of the right side of the neck and pain in the upper right chest. After examination, he thought cancer was present but did not know where it was located. Thereafter he "tried to build him up, gave him penicillin and advised X-rays and other laboratory work-ups." But Fannick became progressively worse. In September he was unable to leave the house and on October 9 he was admitted to the hospital.
This doctor's testimony came in for severe attack. He produced no records of his treatments in July or August, or of any X-rays or "work-ups" he claimed to have suggested. A signed memorandum was produced in which he said that Fannick's "first visit was made to my office September 24, 1951 and that thereafter treatments were administered daily until October 9 when he was admitted to St. Mary's Hospital, Orange, N.J."
Moreover, the St. Mary's Hospital record gives the history as "headaches, slowly increasing since about three weeks * * * states that he lost about 15 pounds in past few weeks." The record of the Newark Eye and Ear Infirmary where a brain operation was performed on October 23, says: "About a month ago he began to complain of pain back of head, believed he had a bad tooth, had a tooth extracted from right jaw but this did not give him any relief. * * * Has lost a lot of weight the past month * * *."
*561 Death occurred two days after the operation. Autopsy showed the cause as cancer of the right kidney with metastasis to the liver, spleen, adrenals, lymph nodes and brain. Dr. Edward F. Murray, who performed the postmortem, said that the primary cancer was in the kidney and that the extensive nature of its diffusion indicated that it had existed for more than six months. He said also that kidney cancer does not as a rule manifest itself early in its growth and that until the manifestations appear the patient is able to carry on his ordinary activity. Usually the first symptom is blood in the urine.
In this connection it may be noted that the evidence of the widow was to the effect that this symptom appeared around Easter and in July 1951. On the first occasion a week was lost from work. The son also spoke of blood in his father's bed in July.
Dr. Deignan testified that after the examination in July he considered Fannick totally disabled "from a medical viewpoint." He was asked also whether from a "medical viewpoint of a doctor, knowing the full and complete history of the course of this person's medical condition and the result of the findings on autopsy * * *" Fannick "was totally disabled uninterruptedly from the time of" that examination "to the date of death." He answered that he believed so.
On cross-examination he expressed the opinion that in July Fannick was not able to work, should not have been working and if he did work it would have been against advice. He conceded that if a man is working "he is not totally disabled regardless of anybody's opinion." Then he was asked:
"Q. Then if someone is working he is not totally disabled regardless of what may be his medical state of health?
A. The question is how good a job he is doing when he does work. I don't believe that man could do a day's work.
Q. Then if a man does a regular day's work, works a full work week, and is paid for it, in your opinion is he totally disabled?
A. If he does a full day's work he is certainly not disabled.
Q. If he is working regularly at his job every working day during the week and is paid for it, in your opinion is that man totally *562 disabled so as to be prevented from engaging in any and every business or occupation and from performing any work for compensation or profit?
A. Again, if a man is working he is not disabled."
Decedent's son testified that his father did not look for employment in July. However, it is undisputed that Fannick began to work as a painter on August 13, and he worked regularly until September 10 when he telephoned his employer saying he would not be in because of pains in his head. He seems to have had some experience as a painter in his earlier years and on the recommendation of his landlord, the painting contractor gave him employment.
He worked six full eight-hour days plus three hours overtime the first week, and six eight-hour days the second and third weeks. The fourth week, which included the Labor Day week-end, he worked only four full days. And the next Monday, which was September 10, the employer received the telephone call already referred to, after which he never reported for work. During this employment period, decedent's wages were 50% greater than his earnings with American Tobacco Company.
According to McDonald, the employer, Fannick was not a first-class painter, although he did improve "to the extent that he got his hand back into training." He was given secondary work such as painting screens and fire escapes, but no scaffold work. McDonald said that he personally worked on the various jobs where Fannick and three other painters were engaged; sometimes he was there all day, on other occasions he stayed only an hour. He never noticed anything unusual about Fannick's speech or motion of his neck.
Defendant moved for judgment at the close of the trial on the ground that the decedent was not totally disabled within the meaning of the policy. The motion was denied and the case was given to the jury. On this appeal it is suggested in the brief that the trial court might properly have ruled otherwise. Of course, if this is so, the trial errors complained of by plaintiff would not justify a reversal of the jury verdict for the defendant. R.R. 1:5-3(b).
*563 The problem of whether the jury should have been permitted to decide if Fannick was totally disabled as required by the insurance contract is not without difficulty. Was there evidence reasonably tending to show (1) that Fannick was totally disabled on July 30, 1951, the termination date of his employment, and (2) that such disability continued uninterruptedly to the date of his death?
Whatever may be thought of the probative force of Dr. Deignan's testimony, his assertion was that around July 15 total disability existed, even though a positive diagnosis of cancer was not made then.
At this time the complaints were pain in the throat and chest, stiffness of the neck, extreme weakness and loss of considerable weight. The loss of weight and the lay testimony of blood in the urine around Easter and in July on the basis of Dr. Murray's testimony pointed to kidney cancer and supported Dr. Deignan's provisional diagnosis. The frequent taking of anacin and aspirin pointed toward the head pains and the developing head cancer. The lay testimony further showed that insured's appetite was poor; he slept poorly; was always tired and wanted to lie down and rest. Speech was poor and was lost at times. He was progressively losing weight in July.
According to Dr. Deignan, Fannick felt sick continually in July and did not "improve the least bit." On the contrary he became progressively worse. As a result the medical conclusion was reached that he was not fit to work, was not able to do a day's work, and he was told not to work. He did no work in July.
The sum of this evidence warranted the conclusion that a jury question was present as to whether total disability existed on July 30, 1951.
Whether the total disability continued uninterruptedly until death is more difficult of solution. The proof indicates in a substantial way that Fannick was suffering from the fatal disease when his employment terminated and that it grew progressively worse until death occurred. According to his widow and son, he could not eat or sleep properly; he was *564 always tired; Dr. Deignan said he suffered from extreme weakness; he took aspirin and anacin for head pains; his wife gave him hot water bottles for his stomach; he was extremely nervous; had pain in his throat with hoarseness and loss of voice at times; stiffness in his neck, and progressive loss of weight. The evidence would support a finding that between the spring of 1951 and the time of death he had lost 40 pounds. It would justify the conclusion that the cancer was present and spreading through decedent's body during the period. And the doctor said the total disability was present without interruption till the death.
However, it is undisputed that the insured worked regularly for three full weeks successively and four days in the fourth week, and that he was paid therefor.
Total disability is a relative, not an absolute concept and its existence depends upon the circumstances of the particular case. Shabotzky v. Equitable Life Assurance Society, 257 App. Div. 257, 12 N.Y.S.2d 848 (App. Div. 1939); Halperin v. Equitable Life Assurance Society, 125 Misc. 422, 210 N.Y.S. 720 (Munic. Ct. 1925). The circumstances are appraised in the light of the general rule that liberal construction of the policy is warranted to protect the insured. 1 Appleman, Insurance Law and Practice (1941), § 671, p. 829.
The term "uninterruptedly" is likewise relative, not absolute. Literal construction in all cases would defeat the purpose of insurance. It should be interpreted in the same sense as "continuously" in this type policy, which has been said to signify substantial or reasonable continuity. Anair v. Mutual Life Ins. Co., 114 Vt. 217, 42 A.2d 423, 159 A.L.R. 547 (Sup. Ct. 1945).
So the fact that the insured did some work or worked for some period of itself does not negative uninterrupted total disability. Generally the question is one for jury determination. 29 Am. Jur., Insurance, § 1161, p. 873; Annotation, 149 A.L.R. 7, 68.
In Booth v. United States Fidelity & Guaranty Co., supra, 3 N.J. Misc. 735, 737 (Sup. Ct. 1925), it was declared that:
*565 "To say that it did not wholly disable and prevent the insured from the date of the accident from performing his duties, because he endeavored to perform them, is to put a strained and unfair interpretation upon the term used, and to do violence to the obvious purpose of the contract. The fact that Booth tried to work is not to be taken as conclusive evidence of his ability to do so. On the contrary, the agreed facts leave no doubt that, from the time of the injury, he was in a serious condition, and that prudence required that he refrain from all effort until he was cured. In the observation of all there have been instances where men have stuck to their posts long after ability was gone, and there are historic instances of dying men persisting in performing duty. Plaintiff should not be penalized for honest efforts to keep going when nature demanded that he desist."
In Carter v. United States, 49 F.2d 221, 223 (4th Cir. 1931), the court said:
"Some persons, who are totally incapacitated for work, by virtue of strong will power may continue to work until they drop dead from exhaustion, while others with lesser will power will sit still and do nothing. * * *"
The language of the Supreme Court of Alabama in Equitable Life Assurance Society of United States v. Watts, 230 Ala. 297, 160 So. 713 (1935), is noteworthy:
"If work is accompanied by suffering, aggravation of a chronic disease, in such sort that sound medical advice says not to work, the fact that there is still strength to do it at times, and, under stress of circumstances, he does so perform, will not defeat his right to the total permanent disability under stipulations here presented."
And see: Potts v. Travelers Ins. Co., 75 Ohio App. 401, 62 N.E.2d 583 (Ct. App. 1944); Shabotzky v. Equitable Life Assurance Society, supra; Fohl v. Metropolitan Life Insurance Co., 54 Cal. App.2d 368, 129 P.2d 24, 30 (Dist. Ct. App. 1942); United States v. Vineyard, 71 F.2d 624 (5th Cir. 1934), certiorari denied 293 U.S. 614, 55 S.Ct. 141, 79 L.Ed. 703 (1934); Clarkson v. New York Life Insurance Co., 4 F. Supp. 791 (D.C.S.D. Fla. 1933); Eisenhauer v. New York Life Insurance Co., 125 Pa. Super. 403, 189 A. 561 (Sup. Ct. 1937); Rathbun v. Globe Indemnity Co., 107 Neb. 18, 184 N.W. 903, 24 A.L.R. 191 (Sup. Ct. 1921); *566 American Liability Co. v. Bowman, 65 Ind. App. 109, 114 N.E. 992 (App. Ct. 1917); 1 Appleman, Insurance Law and Practice, supra, p. 778.
It is true that there is a paucity of proof in this case as to Fannick's actual ability to work as a "secondary" painter. Cf. Booth v. United States Fidelity & Guaranty Co., supra; Woodrow v. Travelers Ins. Co., supra. The record does not specifically reveal what his reaction was to the doing of the work, what the effect of the exertion was upon his physical being and on the disease. However, the state of the proof is such as to sustain the inference that the activity could not be engaged in without difficulty, discomfort and strength of will.
If Dr. Deignan is believed, the effort to work was pursued over a short period of time in the face of medical advice to the contrary. It ended because of the ravages of the disease and death followed shortly thereafter. Whether engagement in work over that period amounted to an interruption of the total disability under all of the circumstances in our judgment constituted a question for the jury to decide.
Our review of the facts, although resulting in the conclusion that the issues were for determination by the jury, makes it plain almost without actual expression, that the verdict of the jury in favor of the defendant was not contrary to the weight of the evidence.
Thus we are brought to consideration of alleged errors in the charge of the court. It is necessary to consider only one of them. At the written request of the defendant, the court charged:
"9. If you find that Mr. Fannick was employed by and worked regularly for Mr. McDonald as a painter and was paid an appropriate wage for his work, then I charge you that he was not then totally disabled within the meaning of the group policy, even though he may have been suffering during the time he worked for Mr. McDonald from a disease which subsequently proved fatal."
This language in effect instructed the jury to bring in a verdict for the defendant. The proof showed without dispute that the decedent was occupied as a painter every work day *567 for three full weeks and for four working days the following week and that he was paid an appropriate wage therefor.
As demonstrated by the cited cases, the fact of work and appropriate pay is not dispositive of the issue of total disability or of its uninterrupted character. The issue is not whether Fannick worked and was paid for it, but whether he was totally disabled on July 30, 1951 and whether that disability was substantially continuous from that date to the time of death. The proof of the work for McDonald was an element for consideration on both facets of the problem, but it was not dispositive as a matter of law as to either one under the circumstances of this case. And it was error to so instruct the jury.
We find no prejudicial error in any of the other grounds presented.
The judgment is reversed and a new trial ordered.