254 N.J. Super. 502 (1992)
604 A.2d 112
BERNICE M. BALDASARRE AND MARGARET M. NEUMANN, PLAINTIFFS-APPELLANTS AND CROSS-RESPONDENTS,
v.
WILLIAM B. BUTLER, HOOLEY, BUTLER, DIFRANCESCO & KELLY, NEALE F. HOOLEY; DONALD T. DIFRANCESCO AND GERALD C. KELLY, DEFENDANTS-RESPONDENTS, AND PAUL M. DIFRANCESCO, JR., DEFENDANT-RESPONDENT AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 29, 1991.
Decided February 21, 1992.
*507 Before Judges MICHELS, O'BRIEN and HAVEY.
Edwin J. McCreedy argued the cause for appellants/cross-respondents (McCreedy & Cox, attorneys; Edwin J. McCreedy on the briefs).
*508 Arnold K. Mytelka argued the cause for respondents William B. Butler; Hooley, Butler, DiFrancesco & Kelly; Neale F. Hooley; Donald T. DiFrancesco and Gerald C. Kelly (Clapp & Eisenberg, attorneys; Arnold K. Mytelka and Madeline E. Cox on the brief).
A. Dennis Terrell argued the cause for respondent/cross-appellant Paul M. DiFrancesco, Jr. (Shanley & Fisher, attorneys; A. Dennis Terrell on the brief).
The opinion of the court was delivered by HAVEY, J.A.D.
Plaintiffs Bernice M. Baldasarre and Margaret M. Neumann appeal from a judgment, entered after a bench trial, dismissing their complaint seeking rescission and damages against defendants. Plaintiffs also appeal from the judgment entered in favor of defendant Paul M. DiFrancesco, Jr. (DiFrancesco) on his counterclaim awarding him damages in the amount of $1,530,000, and compelling plaintiffs to convey to him the subject property and an easement on plaintiffs' adjoining property. On appeal, plaintiffs contend that (1) their attorney, defendant William B. Butler, Esq., engaged in a conflict of interest by representing them and DiFrancesco in the subject real estate transaction; (2) Butler's conflict of interest constituted legal and equitable fraud, imputable to DiFrancesco; (3) defendants' fraudulent conduct was sufficient to compel rescission of the agreement and/or an award of compensatory and punitive damages; (4) DiFrancesco's counterclaim for tortious interference with his contractual rights was insufficient as a matter of law, and (5) the trial court erred in ordering plaintiffs to convey to DiFrancesco an emergency access easement over their Watchung property. DiFrancesco cross-appeals from the dismissal of his claim for punitive damages on his counterclaim against plaintiffs.
We reverse and remand for the entry of judgment awarding plaintiffs compensatory damages against defendants, and for a *509 hearing on plaintiffs' punitive damage claim. We also reverse the judgment awarding him damages on his counterclaim, and affirm the dismissal of his punitive damage claim.
Bernice M. Baldasarre and Margaret M. Neumann are surviving daughters of Arthur Santucci, who died in 1982. Butler and his law firm represented the Santucci estate and also represented plaintiffs and their respective spouses in various real estate transactions and third-party disputes. As beneficiaries of the Santucci estate, plaintiffs inherited a 40.55 acre tract in Warren Township, Somerset County, zoned for single-family residential use, and a contiguous parcel in Watchung Borough.
During the years 1986 and 1987, plaintiffs received offers to purchase the Warren Township tract, ranging from $60,000 to $117,000 per building lot, subject to subdivision approval. In most instances, plaintiffs discussed the offers with Butler, and for a variety of reasons each offer was rejected by plaintiffs. One of the offers was made by PML Associates, a partnership which included a local developer, Charles Messano.
According to Mrs. Neumann, at a meeting in early February 1987, Butler told plaintiffs that his client, DiFrancesco, a local real estate developer and brother of Butler's law partner, had offered to purchase the property at $100,000 per lot. Plaintiffs demanded $110,000 per lot, payable in cash with no mortgage contingency. According to Butler, plaintiffs had asked him to make an inquiry of his clients as to whether there was an interest in acquiring the tract. Also, he testified that he had suggested plaintiffs obtain an appraisal of the property and consider selling the property by public auction.
Butler thereafter discussed plaintiffs' proposal with DiFrancesco, who expressed an interest in purchasing the property at the $110,000 figure. He advised Butler he would pay a $50,000 deposit, and insisted upon the right to assign the agreement. He also asked Butler to represent him during the transaction and in obtaining subdivision approval.
*510 Butler conveyed DiFrancesco's offer to plaintiffs, and explained to them the meaning of a buyer's right to assign the agreement. He also told plaintiffs that he had represented DiFrancesco in the past. According to Butler, he explained that if plaintiffs objected to him representing DiFrancesco, he would not do so. On February 6, 1987, DiFrancesco delivered the $50,000 deposit to Butler and signed the agreement as well as a "conflict of interest" letter prepared by Butler.
On February 9, 1987, Butler again met with plaintiffs and presented the proposed agreement to them. The agreement provided for a purchase price of $2,200,000 computed based on 20 subdivided lots. It was subject to DiFrancesco obtaining preliminary major subdivision approval of at least "15 sewered single family building lots" within six months, and provided that if DiFrancesco "has been moving ... expeditiously," he was given 90 additional days to obtain approval. This subdivision contingency, however, was waivable by DiFrancesco. The agreement also provided the following:
The Buyer may assign the within contract. In the event of assignment, the Buyer shall remain individually liable to satisfy all the obligations of the Buyer as set forth in this contract.
According to Butler, he explained to plaintiffs each paragraph of the agreement in detail as well as the potential conflicts of interest raised by various terms in the event he represented both plaintiffs and DiFrancesco. He also presented to plaintiffs a conflict of interest letter which disclosed his prior representation of DiFrancesco, his intent to represent DiFrancesco in the transaction and before the planning board, and that DiFrancesco was his law partner's brother. The letter also stated that plaintiffs had instructed Butler to find a purchaser for the property and acknowledged that the $110,000 per lot price was fair and reasonable. Butler testified that he suggested plaintiffs take the agreement and conflict of interest letter to another attorney "for independent advice and consultation" and plaintiffs rejected the suggestion. On February 12, 1987, plaintiffs signed the agreement and conflict of interest *511 letter. It is undisputed that the purchase price was adjusted to $1,980,000 based on DiFrancesco's application to the planning board for an 18-lot, rather than 20-lot subdivision. It also is stipulated that the $1,980,000 price was "fair and reasonable" as of the date of the agreement.
On April 9, 1987, DiFrancesco entered into a written agreement with Messano Construction Co., Inc. (Messano), Charles Messano's company, to sell the subject property to Messano at a price of $3,600,000, based on $200,000 per subdivided lot. The agreement was contingent upon DiFrancesco closing with plaintiffs and his obtaining preliminary major subdivision approval within 18 months. It also included a "Confidentiality" clause, prohibiting Messano from entering the property and listing or advertising the property for sale during the term of the agreement. The agreement stated that the purpose of the clause was "among other things, not to jeopardize" the subdivision application process. However, according to Messano, the clause was inserted because Butler and DiFrancesco did not want plaintiffs to know that DiFrancesco had assigned the agreement. Messano also testified that Butler said "it would be [Butler's] problem when [plaintiffs] did find out about it." Butler denied he made these statements, and testified that the central purpose of the clause was to prevent the planning board from knowing that someone other than DiFrancesco owned the property.
On various occasions during the spring and summer of 1987, plaintiffs met with Butler to execute planning board documents and to discuss the status of DiFrancesco's subdivision application. The Messano agreement was never mentioned. Butler conceded he never told either plaintiff directly about the Messano agreement at any time because he had no confidence in it. According to Butler, on May 20, 1987, he met with Constant Baldasarre, plaintiff Baldasarre's husband, on an unrelated matter and advised him of the Messano agreement and asked him to "relay" the information to plaintiffs. He testified that he assumed Mr. Baldasarre had conveyed the information to *512 plaintiffs. Mr. Baldasarre denied that Butler told him about the Messano agreement.
Upon the expiration of the six-month period within which subdivision approval was to be obtained under the plaintiffs/DiFrancesco agreement, the contingency was extended for 90 days, or until November 12, 1987. However, some time in October 1987, DiFrancesco indicated to Butler that subdivision approval could not be obtained within the agreed-upon time period because of difficulties encountered before the various boards. He therefore asked Butler to obtain from plaintiffs an additional six-month extension of the subdivision contingency with an additional 90-day extension, if necessary. In return, DiFrancesco offered to release to plaintiffs the $50,000 deposit held in escrow.
On October 7, 1987, Butler met with plaintiffs to discuss the extension requested by DiFrancesco. Mrs. Neumann testified that plaintiffs resisted the extension because the value of the property "was escalating so fast." Butler admitted he did not tell plaintiffs of the Messano agreement at this meeting because it "didn't occur" to him to tell them. Also, it is uncontradicted that at the meeting Butler did not give plaintiffs advice about whether or not to sign the extension, but did advise them that DiFrancesco could either void the deal or waive the subdivision contingency and close title if the extension was not granted. DiFrancesco testified that if plaintiffs had refused to extend, he was ready and able to close title immediately. Plaintiffs discussed the extension between themselves and agreed to it. The $50,000 was thereupon released to them in consideration for the extension.
In early January 1988, Mrs. Neumann heard a "rumor" that the property had been "resold" by DiFrancesco. She immediately called Butler who again made no disclosure of the Messano agreement but instead recommended that plaintiffs attend a board of health meeting on January 12, 1988 and discuss the matter with DiFrancesco. While Butler was present during a *513 conversation between Mrs. Neumann and DiFrancesco at that meeting, the Messano agreement was not mentioned.
In the latter part of January 1988, plaintiffs learned that DiFrancesco had sold the property and that Butler represented DiFrancesco in that transaction. Plaintiffs thereupon retained new counsel and during a February 11, 1988 meeting with their new lawyer, reviewed the Messano agreement for the first time.
On March 17, 1988, plaintiffs filed the present action against Butler, his law firm and DiFrancesco, seeking a rescission of their agreement with DiFrancesco, and compensatory and punitive damages. The gravamen of the complaint is that Butler and DiFrancesco had committed legal and equitable fraud by wrongfully withholding the existence of the Messano agreement from plaintiffs, thereby inducing them to grant the October 7, 1987 extension. Plaintiffs also claimed that Butler had violated his professional responsibility to plaintiffs and that Butler's law firm was jointly and severally liable for his conduct. DiFrancesco filed an answer and counterclaim seeking specific performance of the agreement and compensatory and punitive damages for plaintiffs' tortious interference with his prospective economic advantage under the Messano agreement.
On April 25, 1988, DiFrancesco's subdivision application was approved and on April 26, 1988, DiFrancesco, through his new attorney, notified plaintiffs' counsel that he was prepared to close on the agreement with plaintiffs, and if plaintiffs refused to do so, plaintiffs would be held "responsible for all damages sustained[.]"
In response to a pretrial motion filed by DiFrancesco, the trial court entered an order on September 19, 1988 compelling plaintiffs to close title on or before October 9, 1988 with the proviso that approximately $1,620,000 (the difference between the purchase price under the plaintiffs/DiFrancesco and DiFrancesco/Messano agreements) be held in escrow. On September 23, 1988, DiFrancesco notified Messano that he was *514 ready and able to convey title to the property under the DiFrancesco/Messano agreement. Time was made of the essence. On October 4, 1988, we denied plaintiffs' motion for a stay of the September 19, 1988 order, and on October 6, 1988, plaintiffs notified DiFrancesco of their willingness to comply with the trial court's order and close title, provided DiFrancesco tendered the purchase price of $1,980,000. DiFrancesco's attorney responded by stating that plaintiffs had not complied with the September 19, 1988 order because plaintiffs could not deliver "marketable" title. DiFrancesco's title company would not insure title because of the pendency of plaintiffs' rescission complaint. By letter dated October 7, 1988, Messano's attorney notified DiFrancesco that Messano deemed the DiFrancesco/Messano agreement "null and void" because DiFrancesco was unable to convey marketable title.
Eleven months after completion of the bench trial, the trial court rendered a written opinion, dated July 3, 1990. The court first found that Butler had "comprehensively complied" with ethical guidelines in undertaking his dual representation of plaintiffs and DiFrancesco by advising plaintiffs of the potential conflicts, recommending they seek independent legal counsel and having them sign a "comprehensive" conflict of interest letter. The court then rejected plaintiffs' claim of fraud. Specifically, it found no intentional concealment on Butler's part, noting that Butler had told Mr. Baldasarre of the Messano agreement and had asked him to convey the information to plaintiffs. The court also concluded that even if Butler had concealed the existence of the Messano agreement, plaintiffs did not rely upon Butler's fraud or suffer a detriment since, if plaintiffs had not granted the extension on October 7, 1987, DiFrancesco would have waived the subdivision contingency and closed title "as was his right." The court therefore found no basis for a rescission of the agreement. Alternatively, it concluded that rescission could not be ordered because the property could not be returned to the status quo ante, since DiFrancesco had expended substantial funds in obtaining subdivision *515 approval. The court also dismissed plaintiffs' claim for compensatory and punitive damages.
As to DiFrancesco's counterclaim, the trial court found a "concentrated effort" on the part of plaintiffs and their attorney to "deprive Mr. DiFrancesco of his profit under the Messano contract" which was "obvious" from plaintiffs' counsel's "correspondence." It therefore concluded that plaintiffs had tortiously interfered with DiFrancesco's prospective economic advantage under the Messano agreement. In fixing DiFrancesco's damages, the court appointed an appraiser to determine the "present fair market value" of the property and directed plaintiffs to convey title within 14 days. Upon receipt of the appraisal the court awarded damages to DiFrancesco in the amount of $1,530,000, together with prejudgment interest at 8%. It also ordered plaintiffs to convey to DiFrancesco an emergency access utility easement over their Watchung property, required by the planning board, at a price of $26,500. Thus, plaintiffs received a total payment for their conveyance of $142,834.25, which included the $50,000 deposit. DiFrancesco's claim for punitive damages against plaintiffs was dismissed.

I
Plaintiffs first argue that the trial court erred in finding that Butler had not violated standards of professional ethics in representing both plaintiffs and DiFrancesco during the subject real estate transaction. The court found that an attorney may undertake a multiple representation of parties in such a transaction "so long as certain standards are met," and that Butler had met such standards. We agree with plaintiffs that Butler's dual representation, under the circumstances, constituted a conflict of interest. We also agree that plaintiffs' execution of the "conflict of interest" letter did not cure the conflict and that Butler's dual representation was the genesis of the underlying dispute between the parties.
*516 RPC 1.7 entitled "Conflict of Interest: General Rule," provides in part as follows:
(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client unless:
(1) the lawyer reasonably believes that representation will not adversely affect the relationship with the other client; and
(2) each client consents after a full disclosure of the circumstances and consultation with the client, except that a public entity cannot consent to any such representation.
(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
(1) the lawyer reasonably believes the representation will not be adversely affected; and
(2) the client consents after a full disclosure of the circumstance and consultation with the client, except that a public entity cannot consent to any such representation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.
(c) This rule shall not alter the effect of case law or ethics opinions to the effect that:

(1) in certain cases or categories of cases involving conflicts or apparent conflicts, consent to continued representation is immaterial[.] [Emphasis added.]
In In re Kamp, 40 N.J. 588, 594, 194 A.2d 236 (1963), our Supreme Court held that an attorney who represented a developer-seller and the buyer in a single-family residential transaction violated Canon 6 of the Canons of Professional Ethics when the attorney failed to disclose to the buyer his relationship with the seller and failed to "explain in detail the pitfalls that may arise in the course of the transaction which would make it desirable that the buyer have independent counsel." Id. at 596, 194 A.2d 236. See also In re Dolan, 76 N.J. 1, 9, 384 A.2d 1076 (1978) ("[i]n a real estate transaction, the positions of vendor and purchaser are inherently susceptible to conflict"). By implication the Court in In re Kamp found no conflict of interest in dual representation, at least in a simple real estate transfer, where full disclosure is made of potential conflicts, the limited scope of the attorney's intended representation of the buyer's interest is communicated, and the advantages of the *517 buyer retaining independent counsel are revealed. 40 N.J. at 596, 194 A.2d 236. Indeed, in In re Dolan, 76 N.J. at 12-13, 384 A.2d 1076, the Court declined to adopt the per se ruling urged by Justice Pashman in In re Lanza, 65 N.J. 347, 353, 322 A.2d 445 (1974), (Pashman, J., concurring), which would be a complete bar of dual representation, because the consequences of such a per se rule would leave "many prospective purchasers in marginal financial circumstances ... without representation." In re Dolan, 76 N.J. at 13, 384 A.2d 1076. However, we do not read Lanza or Dolan as endorsing dual representation in all real estate transactions where full disclosure is made by the attorney. To the contrary, in both decisions the Court underscored the inherent dangers that loom in dual representation and suggests that it will be the unusual case that no conflict of interest will exist.
In In re Lanza, the Court again underscored the "pitfalls that await an attorney representing both buyer and seller in a real estate transaction." Citing the Advisory Committee on Professional Ethics, Opinion 243, 95 N.J.L.J. 1145 (1972), the Court noted that "in all circumstances it is unethical for the same attorney to represent buyer and seller in negotiating the terms of a contract of sale." In re Lanza, 65 N.J. at 352, 322 A.2d 445 (emphasis added). Opinion 243 states that:
Generally, it is at this stage of negotiations for the sale of property that a buyer and a seller have their greatest difficulties. Their interests are in conflict if for no other reason than the buyer wishes to obtain the property as cheaply as possible and the seller wishes to get the highest price. At this juncture, also, there can and frequently do arise disputes concerning fixtures to be left in the premises, assumption of mortgages, mortgage contingencies, and other matters in which there can be serious disagreements, in all of which the interests of the buyer and seller will be diametrically opposed.

....
We, therefore, conclude that, assuming full disclosure and consent, the practice of one attorney's representing both the borrower and the lender may present problems in some instances, but is not unethical and is not precluded by decisional law and should be approached with great caution. However, the representation of a buyer and a seller in connection with the preparation and execution of a contract of sale of real property is so fraught with *518 obvious situations where a conflict may arise that one attorney shall not undertake to represent both parties in such a situation. [Emphasis added.]
Thus, where the attorney is called upon to participate in the negotiations of the terms of the transaction, a conflict of interest will exist and "consent to continued representation is immaterial[.]" RPC 1.7(c)(1).
We are satisfied that this is one of the "certain cases" contemplated by RPC 1.7 which made plaintiffs' execution of the "conflict of interest" letter "immaterial." Butler's dual representation of the parties during the negotiations of this complex transaction plainly ignored and violated the admonition in Lanza and Opinion 243 that "it is unethical for the same attorney to represent buyer and seller in negotiating the terms of a contract of sale." In re Lanza, 65 N.J. at 352, 322 A.2d 445. While it is true that the purchase price was not the subject of negotiation, other provisions of the agreement were fraught with potential conflicts. The $50,000 deposit, the figure offered by DiFrancesco, was agreed to by plaintiffs without any apparent effort on Butler's part to negotiate a higher figure. Although DiFrancesco demanded the right to assign the agreement without plaintiffs' consent, Butler could have demanded on plaintiffs' behalf that DiFrancesco at least give notice to plaintiffs of such assignment. Such notice would no doubt have prevented the present dispute. Also, during the pendency of the agreement, questions may have arisen as to whether DiFrancesco had pursued planning board approval "expeditiously," thereby giving him the right to the additional 90-day extension. A question may also have arisen as to the reasonableness of the number of lots DiFrancesco applied for, or whether title being conveyed by plaintiffs was marketable. In short, we cannot conclude that plaintiffs had shed their right to undivided loyalty during the negotiation of this complex agreement simply because they executed the conflict of interest letter and Butler had alerted them to the potential conflicts.
In any event, whatever may be said about Butler's initial representation of the parties, we are convinced that during the *519 October 7, 1987 meeting with plaintiffs, when the extension of the subdivision contingency was discussed, Butler had an absolute duty to advise plaintiffs of the existence of the Messano agreement. At this point, Butler's representation of plaintiffs was "materially limited by [his] responsibilities to another client," DiFrancesco, and his failure to disclose plainly violated the letter and spirit of RPC 1.7. DiFrancesco needed more time to obtain subdivision approval in order to keep the Messano agreement alive and reap the approximate $1.6 million profit if that agreement was consummated. Thus, it was in DiFrancesco's best interest that Butler not disclose the Messano agreement to plaintiffs since such disclosure no doubt would have induced plaintiffs not to grant the extension.
On the other hand, it was in plaintiffs' best interest that Butler disclose the existence of the Messano agreement, since disclosure would have confirmed their belief that the value of the property had escalated and they were better off refusing the extension and seeking another buyer in the open market. Alternatively, had plaintiffs known of the Messano agreement they may have insisted, with good reason, on a greater consideration for the extension than simply release of the $50,000 deposit. This option was never discussed, or even mentioned by Butler. Further, had DiFrancesco waived the subdivision contingency upon plaintiffs' refusal to extend, plaintiffs were at least entitled to an immediate closing of title and receipt of the entire $1,930,000 balance of the purchase price.
The trial court found it significant that plaintiffs had testified they would not have closed had they known about the Messano agreement. This finding misses the point. It is entirely speculative as to what plaintiffs would or would not have done had full disclosure been made in light of the various options available to them. In our view, Butler found himself in a position of conflicting loyalties during the October 7, 1987 meeting and his failure to disclose the Messano agreement constituted a conflict *520 of interest which clearly compromised plaintiffs' rights.[1]

II
Plaintiffs next argue that Butler's conduct constituted fraud, imputable to DiFrancesco, and thus the February 12, 1987 agreement and October 7, 1987 extension "were void ab initio." As stated, the trial court found no fraud, legal or equitable.
Ordinarily, we defer to the trial court's findings if supported by substantial credible evidence on the record as a whole. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). However, if we are satisfied that a "finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction," we may:
appraise the record as if [we] were deciding the matter at inception and make [our] own findings and conclusions. While this feeling of `wrongness' is difficult to define, because it involves the reaction of trained judges in the light of their judicial and human experience, it can well be said that that which must exist in the reviewing mind is a definite conviction that the judge went so wide of the mark, a mistake must have been made. This sense of `wrongness' can arise in numerous ways  from manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, a clearly unjust result, and many others. [State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964).]
In our view, the trial court's determination that plaintiffs failed to prove fraud cannot be sustained on the record before us.
Legal fraud consists of five elements: (1) a material representation by defendant of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intent that the plaintiff rely upon it; (4) reasonable reliance by the plaintiff, and (5) resulting damage to the plaintiff. Jewish Center of Sussex Cty. v. Whale, 86 N.J. 619, 624-25, 432 A.2d 521 (1981); Blitz v. 970 Realty Assocs., 233 N.J. Super. 29, 36, *521 557 A.2d 1386 (App.Div. 1989). The fact that no affirmative misrepresentation is made does not bar relief predicated on a claim of fraud. Silence in the face of an obligation to disclose may be fraud, since the suppression of truth when it should be disclosed is equivalent to an expression of a falsehood. See Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 610, 560 A.2d 655 (1989); Correa v. Maggiore, 196 N.J. Super. 273, 281, 482 A.2d 192 (App.Div. 1984); Berman v. Gurwicz, 178 N.J. Super. 611, 619, 429 A.2d 1084 (Ch.Div. 1981). Equitable fraud, unlike legal fraud, does not require the element of scienter, knowledge of the falsity and an intent to obtain an undue advantage. Enright v. Lubow, 202 N.J. Super. 58, 72, 493 A.2d 1288 (App.Div. 1985), certif. denied, 104 N.J. 376, 517 A.2d 386 (1986). Fraud, of course, is never presumed; it must be established by clear and convincing evidence. Albright v. Burns, 206 N.J. Super. 625, 636, 503 A.2d 386 (App.Div. 1986).
Here, the evidence is compelling that Butler intentionally withheld from plaintiffs the existence of the Messano agreement despite his duty as plaintiffs' attorney to disclose this material fact. Butler had several meetings with plaintiffs after the Messano agreement had been signed, including the critical October 7, 1987 meeting, when the extension in question was given, and Butler inexplicably never disclosed the existence of the agreement. The trial court found that Butler had mentioned the Messano agreement to Mr. Baldasarre at a May 20, 1987 meeting. However, of significance is that the court did not find that Mr. Baldasarre had in fact conveyed this information to plaintiffs. In any event, Butler's duty to disclose was owed to plaintiffs, not to Mr. Baldasarre. Based on the evidence, the conclusion is inescapable that Butler withheld this material fact with the intention that plaintiffs be induced into granting the extension to DiFrancesco.
Plaintiffs' reliance and detriment are also readily ascertainable from the facts. It is undisputed that plaintiffs simply would not have granted the extension at the October 7, 1987 *522 meeting had they known about the Messano agreement. It is true that the trial court found that if plaintiffs had refused the extension, DiFrancesco would have waived the subdivision contingency and closed title immediately. If that is so, plaintiffs would have received the $1,980,000 purchase price immediately instead of having to wait until the subdivision was approved.[2] Moreover, as stated, if plaintiffs had known about the Messano agreement, they may well have bargained for a substantial advance of the purchase price or other consideration for the granting of the extension. We conclude that plaintiffs have clearly and convincingly established the elements of both legal and equitable fraud against Butler, and therefore he and his law firm are liable to plaintiffs for damages. See N.J.S.A. 42:1-13 and -15; see also Malanga v. Manufacturers Casualty Ins. Co., 28 N.J. 220, 227, 146 A.2d 105 (1958).

III
The question then becomes whether Butler's conduct is imputable to DiFrancesco. It is undisputed that Butler was DiFrancesco's agent, since he was acting as DiFrancesco's attorney throughout the real estate transaction. See Weir v. City Title Ins. Co., 125 N.J. Super. 23, 31, 308 A.2d 357 (App. Div. 1973); see also 7 Am.Jur.2d Attorneys at Law § 129 at 196-97 (1980) ("client is bound by the acts of his attorney within the scope of the latter's authority"). Indeed, during defendant's motion to dismiss at the close of plaintiffs' proofs, the trial court observed "[t]here's no question he was. There's absolutely no question [Butler] was an agent [of DiFrancesco]."
It is settled that a principal is subject to liability for loss caused to another by the other's reasonable reliance "upon a tortious representation of a[n] ... agent, if the representation *523 is authorized ... or within the power of the agent to make for the principal." Restatement (Second) of Agency § 257 at 558 (1957). Further, a transaction into which one is induced to enter "by reliance upon untrue and material representations as to the subject matter, made by a[n] ... agent entrusted with its preliminary or final negotiations, is subject to rescission at the election of the person deceived." Id. § 259 at 564. In an action for rescission, "an agent's false statements bind his principal if such agent was authorized to speak for the principal in the course of obtaining the particular contract." Equitable Life Assurance Soc. of U.S. v. New Horizons, Inc., 28 N.J. 307, 314, 146 A.2d 466 (1958); see also 7 Am.Jur.2d § 136 at 200 ("knowledge of an attorney, acquired during the time he is acting within the scope of his employment, is imputed to his client"). Butler's concealment of the Messano agreement at the October 7, 1987 meeting was within his authority as DiFrancesco's agent, since DiFrancesco had instructed Butler to obtain the extension and Butler's concealment was intended to induce plaintiffs to grant the extension to DiFrancesco's benefit. Therefore, Butler's fraudulent conduct during that meeting was imputable to DiFrancesco.

IV
Plaintiffs seek rescission of the February 12, 1987 agreement and October 7, 1987 extension because of defendants' fraud. Rescission is an available remedy in an action for equitable fraud. Bonnco Petrol, Inc., 115 N.J. at 611, 560 A.2d 655. A rescission of a transaction is "the undoing of it; it returns the parties ... to the very ground upon which they originally stood." Driscoll v. Burlington-Bristol Bridge Co., 28 N.J. Super. 1, 4, 99 A.2d 829 (App.Div. 1953). Its object "is to restore the parties to the status quo ante and prevent the party who is responsible for the misrepresentation from gaining a benefit." Bonnco Petrol, Inc., 115 N.J. at 612, 560 A.2d 655.
*524 Here, plaintiffs have established both legal and equitable fraud based on defendants' "misrepresentations" justifying rescission of the October 7, 1987 extension agreement which, in our view, is clearly severable from the underlying agreement of February 12, 1987. See id. at 612-13, 560 A.2d 655.
However, when return to the status quo ante is a "practical impossibility," the equitable remedy of rescission is not available. Ray v. Beneficial Fin. Co., 92 N.J. Super. 519, 539, 224 A.2d 143 (Ch.Div. 1966). We have been advised since oral argument that after plaintiffs complied with the final judgment and conveyed title to DiFrancesco, he installed improvements in the subdivision, sold 14 lots to third parties, and transferred the remaining lots to another entity he controls.[3] In view of the intervening events, rescission is not available since plainly the parties cannot be returned to the status quo ante.
It follows that the only remedy available to plaintiffs at this posture of the case is an award of compensatory and/or punitive damages as a result of the legal fraud committed by defendants. Generally, when a contract is obtained by fraud, the injured party may rescind or affirm, and if he affirms he is entitled to retain or recover the consideration under the agreement as well as money damages for deceit. Merchants Indem. Corp. of N.Y. v. Eggleston, 37 N.J. 114, 130, 179 A.2d 505 (1962). Further, although specific rules measuring damages in fraud cases have been formulated for varying purposes, they must be subordinated to the basic objective of making the injured party whole. Correa, 196 N.J. Super. at 285, 482 A.2d 192; see also Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 48, 477 A.2d 1224 (1984) (compensatory damages for fraud are designed to compensate plaintiff for actual injury or loss).
*525 As stated, defendants' fraudulent conduct in failing to disclose the Messano agreement on October 7, 1987 induced plaintiffs to grant the extension to DiFrancesco. We accept the trial court's finding that had plaintiffs refused the extension, DiFrancesco would have waived the subdivision contingency, as was his right, and closed title immediately. Thus, to make plaintiffs whole, they are entitled to the balance of the purchase price, $1,930,000, together with interest on the entire balance from November 26, 1987. We fix that date because the agreement provides that closing will take place within 50 days after subdivision approval, and we presume that if plaintiffs had denied the extension on October 7, 1987, the parties would have closed within 50 days thereafter. Accordingly, we remand for the entry of judgment in favor of plaintiffs against defendants, jointly and severally, in the amount of $1,930,000 plus interest from November 26, 1987. We also direct that the trial court address plaintiffs' claim for punitive damages against defendants, with further proofs if necessary. See id.; Enright, 202 N.J. Super. at 76, 493 A.2d 1288.

V
We are also satisfied that the judgment entered against plaintiffs in DiFrancesco's favor on his counterclaim based on tortious interference with prospective economic advantage must be reversed. To establish a prima facie case of tortious interference, a plaintiff must demonstrate that he was in pursuit of some "reasonable expectations of economic advantage." Harris v. Perl, 41 N.J. 455, 461-62, 197 A.2d 359 (1964). Second, he must prove that the "interference" by defendant was done intentionally and with "malice." Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 751, 563 A.2d 31 (1989). The term "`malice is not used in the literal sense requiring ill will toward the plaintiff.'" Id., (quoting Restatement (Second) of Torts § 37 at 5 (1979)). Rather, it means that the harm was inflicted intentionally and without justification or excuse. Printing Mart-Morristown, 116 N.J. at 751, 563 A.2d 31. The *526 "malice" element is satisfied if defendant "acted out of a motivation to enhance his financial position ... for profit[.]" Leslie Blau Co. v. Alfieri, 157 N.J. Super. 173, 189, 384 A.2d 859 (App.Div.), certif. denied sub nom., Leslie Blau Co. v. Reitman, 77 N.J. 510, 391 A.2d 523 (1978). Plaintiff must prove that defendant's conduct "must have been transgressive of generally accepted standards of morality"; that is, a violation of standards of "`socially acceptable conduct.'" 157 N.J. Super. at 189, 384 A.2d 859 (quoting 1 Harper and James, Law of Torts, § 6.11 at 511, 513-14 (1956)). See also C.B. Snyder Realty Inc. v. BMW of N. America Inc., 233 N.J. Super. 65, 78-79, 558 A.2d 28 (App.Div.), certif. denied, 117 N.J. 165, 564 A.2d 883 (1989).
In finding that plaintiffs had tortiously interfered with the DiFrancesco/Messano agreement, the trial court first noted that despite its September 19, 1988 order compelling plaintiffs to close with DiFrancesco by October 9, 1988, they "failed and refused to convey good an[d] marketable title to DiFrancesco." The court also observed that:
Evidence was produced at trial of various letters, phone calls and meetings which were undertaken by counsel for the plaintiffs and counsel for Mr. Messano.... Such communication illustrates a concentrated effort to deprive Mr. DiFrancesco of his profit under the Messano contract.
This court finds that the evidence demonstrated that the plaintiffs were continually kept apprised of Messano's desire to avoid his contractual obligations with DiFrancesco. By their refusal to convey good and marketable title to DiFrancesco, the plaintiffs aided Messano in his termination of the DiFrancesco/Messano contract.
The trial court concluded that plaintiffs' "motive to cut DiFrancesco out of his contract with Messano to leave the field open for plaintiffs is also obvious from counsel's correspondence," and that "[t]his scenario" fits the situation where a party "intentionally and maliciously (without equal or superior right) interferes with a present relationship between two other parties[.]"
In our view, DiFrancesco failed as a matter of law to demonstrate the requisite "malice" to sustain a tortious interference *527 claim. There was no basis for a finding of "malice" based on plaintiffs' initial resistance to the trial court's September 19, 1988 pretrial order compelling them to transfer title to DiFrancesco. Preliminarily, the trial court should not have entered such a pretrial order, since substantial fact questions existed respecting plaintiffs' allegations of fraud and their demand for rescission. The order essentially dismissed plaintiffs' rescission claim before they ever had their day in court.
In any event, when the September 19, 1988 order was entered, plaintiffs promptly moved before us for a stay and, when we denied the stay, plaintiffs indicated on October 6, 1988 to DiFrancesco's attorney a willingness to convey title to DiFrancesco. However, DiFrancesco declined to close title because plaintiffs could not convey marketable title to the property by virtue of the pendency of plaintiffs' rescission complaint. On October 7, 1988, Messano's attorney declared the DiFrancesco/Messano agreement void because of DiFrancesco's inability to convey to Messano the subject premises free and clear of all liens. It is therefore clear that the Messano agreement expired under its own terms because of a title exception, not because of plaintiffs' refusal to comply with the trial court's September 19, 1988 order.
We also find no basis in fact for the trial court's conclusion that plaintiffs' "motive to cut DiFrancesco out of his contract with Messano" is "obvious from counsel's correspondence." On September 23, 1988, plaintiffs' counsel wrote to DiFrancesco's attorney advising him of plaintiffs' intention to seek immediate leave to appeal from and stay of the September 19, 1988 order. Plaintiffs' counsel further advised that "[i]n the event [plaintiffs] are compelled to close title with your client on or before October 9, I shall be available [to close] after I have exhausted my remedies at any time[.]" On the same day plaintiffs' counsel wrote to Messano's attorney stating that plaintiffs' counsel understood that the DiFrancesco/Messano closing was scheduled for October 7, 1988. He advised Messano's attorney:

*528 With respect to the fixing of a closing date with you, I would like to point out that one position you might consider is that [Messano] is in no position to schedule a closing with DiFrancesco while Judge Ross' order of September 20 is subject to an application for leave to appeal.
We read this "correspondence" as simply advising the salient parties of plaintiffs' position and continued efforts challenging the validity of the September 19, 1988 order, and to resist conveying title until plaintiffs' legal alternatives were exhausted. The correspondence hardly expresses a "clear ... motive to cut DiFrancesco out of his contract with Messano."
It is true, as stated, that the DiFrancesco/Messano agreement expired because of the title defect caused by plaintiffs' pending complaint and their refusal to dismiss the rescission claim. However, it cannot be said that plaintiffs' pursuit of that complaint was "transgressive of generally accepted standards of morality," Leslie Blau, 157 N.J. Super. at 189, 384 A.2d 859 since their action seeking rescission was well grounded in law and fact. Stated differently, their persistence in prosecuting the action, and their refusal to dismiss the complaint in order to remove the title exception, was motivated by their well-founded desire to protect their legitimate interests in seeking rescission rather than an intention to gain an economic advantage by undermining DiFrancesco's agreement with Messano. We therefore reverse the judgment against plaintiffs awarding damages to DiFrancesco on his counterclaim.

VI
Finally, plaintiffs challenge the post-judgment order entered by the trial court requiring them to grant DiFrancesco an easement for emergency vehicular access over their Watchung parcel, contiguous to the subject property. After judgment was entered, DiFrancesco moved for an order compelling plaintiffs to convey the easement necessitated by the subdivision approval. Plaintiffs opposed the application and requested a plenary hearing. Without such a hearing the trial court ordered the conveyance, fixing a price of $26,500 based upon an *529 appraisal. The court found that since Mr. Neumann, plaintiff Neumann's husband, was present at the planning board hearing when the easement was discussed, plaintiffs were charged with knowledge that the easement was required, and thus were compelled to convey it.
The order should not have been entered, at least without a plenary hearing. It exceeded the scope of the pleadings and trial proofs and was entered without a post-judgment hearing to determine the legal merits of DiFrancesco's demand. Nevertheless, we deem the issue moot since the easement has been granted and is now an integral part of the subdivision. Since the lots have been conveyed by DiFrancesco, we cannot undo the consequences of the trial court's order, even if improvidently entered. Further, plaintiffs do not challenge the value placed on the easement, paid by DiFrancesco.
In view of our findings on plaintiffs' appeal, it is clear there is no merit to DiFrancesco's cross-appeal challenging the dismissal of his claim for punitive damages against plaintiffs.
Reversed and remanded for the entry of a judgment awarding compensatory damages against all defendants, jointly and severally, in the amount of $1,930,000, together with prejudgment interest, and for a hearing on plaintiffs' punitive damage claim. An order vacating the judgment entered against plaintiffs on DiFrancesco's counterclaim shall also be entered.
NOTES
[1] The Clerk is directed to forward a copy of this opinion [and all relevant documents] to the Office of Attorney Ethics for review and such action as is deemed appropriate.
[2] Plaintiffs point out that had DiFrancesco closed title immediately, they would have earned $115,000 in interest income on the proceeds during the nine-month extension they granted to DiFrancesco.
[3] Plaintiffs did not seek a stay pending appeal enjoining DiFrancesco from developing and selling the lots.