625 A.2d 458

BERNICE M. BALDASARRE AND MARGARET M. NEUMANN, PLAINTIFFS–RESPONDENTS, v. WILLIAM B. BUTLER, PAUL M. DIFRANCESCO, JR., HOOLEY, BUTLER, DIFRANCESCO & KELLY, NEALE F. HOOLEY, DONALD T. DIFRANCESCO AND GERALD C. KELLY, DEFENDANTS–APPELLANTS.

Argued December 1, 1992—Decided March 11, 1993.

280

*Arnold K. Mytelka* argued the cause for appellants William B. Butler, Hooley, Butler, DiFrancesco & Kelly, Neale F. Hooley, Donald T. DiFrancesco and Gerald C. Kelly (*Clapp & Eisenberg*, attorneys; *Mr. Mytelka, Agnes I. Rymer*, and *Madeline E. Cox*, on the briefs).

*A. Dennis Terrell* argued the cause for appellant Paul M. DiFrancesco, Jr. (*Shanley & Fisher*, attorneys; *Mr. Terrell, Andrew P. Slowinski*, and *Kenneth J. Wilbur*, on the briefs).

*Edwin J. McCreedy* argued the cause for respondents (*McCreedy and Cox*, attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns the legal problems that arise from an attorney's dual representation of both buyer and seller in a real estate transaction. Initially, plaintiffs, the sellers, commenced an action alleging legal and equitable fraud against the attorney, his law firm, and the buyer. Shortly before oral argument, the parties informed the Court that plaintiffs had settled their claims against the attorney and his firm. Therefore, the only issues remaining are, first, whether one client, the buyer, is vicariously liable for the legal and equitable fraud allegedly perpetrated by his attorney against the attorney's other clients, the sellers; and second, whether the sellers are liable for intentional tortious interference with the buyer's prospective economic gain.

I

In 1982, plaintiffs, Beatrice Baldasarre and Margaret Neumann, inherited from their father, Arthur Santucci, a tract of 40.55 acres of undeveloped land in Warren Township, Somerset County, New Jersey. Plaintiffs retained defendant William B. Butler of the law firm of Hooley, Butler, DiFrancesco & Kelly to act as attorney for their father's estate and for them as co-

executrices of the estate. Butler also represented plaintiffs and their spouses in other legal matters. Plaintiffs had first met Butler when their father had consulted him about a legal matter.

Plaintiffs' father's will directed that the Warren property be sold and the proceeds divided between the two daughters. In 1986 and 1987, plaintiffs received several unsolicited offers to purchase the property, ranging in price from $60,000 to $117,000 per lot. Several offers were made by PML Associates, whose owners included Robert Santye, Frank Pasquerello, and Charles Messano. At one time plaintiffs informed Butler that Mrs. Baldasarre and her husband would purchase the property. However, the Baldasarres were unable to obtain financing, and that proposal fell through. Plaintiffs rejected all the other offers for various reasons.

In January 1987, Baldasarre and Neumann met with Butler. The parties disagree about whether plaintiffs solicited Butler's assistance or whether Butler volunteered it, but the three agreed that Butler would help find a buyer for the property. Plaintiffs told Butler that they wanted a price of $110,000 per lot, with no purchase money mortgage and with the contract subject only to preliminary major subdivision approval.

Butler discussed the property with one of his clients, defendant Paul DiFrancesco, a real estate broker and developer, who also was a brother of one of Butler's law partners. DiFrancesco expressed an interest in purchasing the property on the plaintiffs' terms, but added two conditions. DiFrancesco wanted the right to assign the contract and the right to waive the subdivision contingency. He suggested a deposit of $50,000 and asked Butler to represent him in the purchase and the subdivision approval process. Butler alerted DiFrancesco to the potential conflict of interest that could arise from his dual representation. He also told DiFrancesco that he could not represent him unless plaintiffs consented and executed a conflict-of-interest letter. The next day, Butler delivered to Di-

Francesco a draft contract and a conflicts letter, and advised him to review both documents with another attorney. DiFrancesco did not do so. The conflicts letter provided in part:

The Sellers have requested that you represent them regarding this matter. I have also asked you to represent me as Buyer. You have pointed out to me potential conflicts. All these matters were discussed in detail at the conference in your office on February 5, 1987. Notwithstanding potential conflicts, I still request that you represent me as Buyer, knowing full well that you will also be representing the Sellers. I feel as though your representation of both the Sellers and the Buyer in this matter will actually facilitate and expedite the obligation of both parties under the aforesaid contract.

Butler then met with plaintiffs. He conveyed DiFrancesco's offer and disclosed his relationship with DiFrancesco. He reviewed and explained the additional conditions sought by DiFrancesco. Butler also informed them that he could not represent DiFrancesco if they objected.

A few days later, Butler delivered to plaintiffs a contract executed by DiFrancesco (the "contract" or "Baldasarre contract"). The total contract price was initially $2,200,000, reflecting an anticipated 20 lots, but was later adjusted to $1,980,000 to reflect a subdivision application for 18 lots. Together with the contract, Butler delivered the $50,000 deposit, DiFrancesco's conflicts letter, and a conflicts letter Butler had prepared for their signature. Their conflicts letter was similar to the one that DiFrancesco had signed. Plaintiffs' letter provided in part:

You have indicated to us that you will be representing Paul M. DiFrancesco, Jr. regarding the Buyer's obligation set forth in the aforesaid proposed contract. You have suggested that we take this contract to other counsel and review it before we sign the same. You have pointed out to us potential conflicts if you represented the undersigned as Sellers and Paul M. DiFrancesco, Jr., the Buyer. Notwithstanding such conflicts, we request that you represent us regarding the sale of the subject property. Your association with this property goes back to the death of our late father, Arthur H. Santucci, on September 23, 1982, at which time you acted as attorney for the estate and attorney for the undersigned as co-executrices.

We have received written offers from third parties to purchase the subject property. We had previously instructed you that we would sell the subject property to a client of yours for a price of $110,000.00 per single family building lot. The aforesaid contract contains that price and we have concluded that the

other terms, provisions and conditions set forth in the proposed contract are fair and reasonable.

You discussed all of the above with us in detail at the conference in your office which took place on February 9, 1987.

The contract was contingent on DiFrancesco's obtaining preliminary major subdivision approval within six months, but allowed for a ninety-day extension if he was "moving as expeditiously as practicable" on the extension. The contract also contained an assignment clause that read "The Buyer may assign the contract. In the event of an assignment, the Buyer shall remain individually liable to satisfy all the obligations of the Buyer as set forth in the contract." The contract also contained Paragraph 33, *"Professional Associations on Assignment,"* which provided, in part:

The Buyer has asked William B. Butler, Esq., 190 Elm Street, Westfield, New Jersey to represent him regarding the aforesaid preliminary major sub-division application. In the event the Buyer assigns the within contract pursuant to paragraph 17 above, the assignee shall be required to continue utilizing the engineering services of Fisk Associates and the attorney services of William B. Butler. The purpose of this provision is to insure expediency in the application process so that the applicable dates regarding the obtaining of preliminary major sub-division approval and the anticipated time of closing shall not be interfered with or delayed as a result of the aforesaid assignment.

The contract did not require DiFrancesco to notify the sellers of any assignment. Plaintiffs do not dispute that Butler explained the provisions of the contract and both conflicts letters with them in detail, although they later claimed they had not understood the assignment clause. Plaintiffs also do not dispute that Butler recommended that they review the contract and conflicts letter with another attorney. They did not do so, and on February 12, 1987, plaintiffs signed the contract and the conflicts letter.

In April 1987, DiFrancesco, represented by Butler, entered into a contract (the "Messano contract") to sell the subject property for $200,000 per "approved lot" to Messano Construction Co., Inc., whose principal, Charles Messano, had earlier participated in PML's unsuccessful attempts to purchase the property. DiFrancesco did not assign his rights under the

Baldasarre contract to Messano, but rather contracted to sell the property to Messano once he purchased it from plaintiffs. The Messano contract was contingent on DiFrancesco's taking title to the property and obtaining preliminary subdivision approval within eighteen months. The Messano contract contained an "assignment clause" that permitted the buyers to assign only the "whole contract and not part of this contract." The Messano contract also contained a "confidentiality clause" that barred Messano from entering the property, listing it for sale, or advertising it until his closing. The purpose of the confidentiality clause was "among other things, not to jeopardize the seller from obtaining the approvals set forth in paragraph 10," which referred to securing the preliminary major subdivision approval. Butler did not inform plaintiffs of the Messano contract, although Butler testified, and the trial court found, that in May 1987, Butler had informed Bernice Baldasarre's husband of the Messano contract when he was representing him on an unrelated matter and had asked him to relay the information to plaintiffs.

DiFrancesco was unable to obtain preliminary subdivision approval within six months and sought the ninety-day extension provided for in the Baldasarre contract. Plaintiffs agreed to the extension, apparently relying on Butler's assurance that DiFrancesco was "moving as expeditiously as practicable" on the application. Still unable to complete the subdivision process, DiFrancesco sought another extension. Approximately five to six weeks before the subdivision contingency would expire, DiFrancesco requested Butler to ask plaintiffs if they would grant him a further extension in exchange for the release of the $50,000 deposit. Butler conveyed the offer to plaintiffs and explained that DiFrancesco had the options either to terminate the contract or to waive the contingency and close. He further told plaintiffs, in response to their question, that he did not know which option DiFrancesco would choose if the extension were denied.

Butler did not advise plaintiffs whether to grant or deny the extension and did not inform them of the Messano contract. Plaintiffs discussed the request in private and agreed to grant the requested extension in exchange for the release of the deposit. Butler prepared an amendment to the contract providing for an extension that gave DiFrancesco another six months in which to secure planning board approval, with a possible additional three-month extension if he was proceeding "as expeditiously as practicable." Plaintiffs signed the amendment on October 7, 1987.

Plaintiffs allege that it was not until early January 1988 that they first heard rumors that DiFrancesco had contracted to sell the property. Mrs. Neumann, one of the plaintiffs, immediately called Butler, who suggested that she attend a Board of Health meeting on January 12, 1988, and ask DiFrancesco about the rumors. Mrs. Neumann and her husband attended that meeting, as did Butler and DiFrancesco. However, no one mentioned the Messano contract. Later in January, plaintiffs learned from Santye, one of the principals of PML Associates, of the Messano contract and that Butler had represented DiFrancesco in that transaction. Plaintiffs felt aggrieved that Butler had not told them of the Messano contract and they retained other counsel.

On March 3, 1988, DiFrancesco sent letters to plaintiffs informing them that the subdivision application was complete and was expected to be heard in April. On March 17, 1988, plaintiffs brought the present action alleging legal and equitable fraud and seeking rescission of the contract and compensatory and punitive damages against Butler, his law firm, and DiFrancesco. DiFrancesco counterclaimed, charging tortious interference with his prospective economic advantage from the Messano contract and seeking specific performance and compensatory and punitive damages.

DiFrancesco proceeded with the subdivision application and secured approval on April 25, 1988. Having already secured

the necessary financing, the next day DiFrancesco notified plaintiffs he was prepared to close. Plaintiffs did not respond. DiFrancesco therefore moved for an order compelling plaintiffs to close

in order that defendant, Paul M. DiFrancesco, Jr., can close a contract with Messano Construction Company on condition that defendant, Paul M. DiFrancesco, Jr., will agree that following the completion of the closing of the Messano contract, he will hold in escrow the difference or approximately $1,620,000 until this action is decided on the merits or concluded by agreement of the parties.

On September 19, 1988, the trial court ordered plaintiffs to close and accept payment on or before October 9, 1988 "on the conditions set forth in the application." However, the closing did not occur before the October 9 deadline because DiFrancesco's title insurance company would not insure title because the pendency of plaintiffs' rescission claim rendered the title unmarketable. Messano then notified DiFrancesco that their contract was null and void because DiFrancesco could not convey marketable title within the eighteen-month period required by the Messano contract.

During the period from August to October 1988, when DiFrancesco's motion was pending, counsel for plaintiffs corresponded with counsel for Messano. The correspondence reveals the intent of plaintiffs and Messano to avoid closing on either contract with DiFrancesco. For example, on September 23, 1988, counsel for Messano wrote to plaintiffs' counsel:

as I informed you I would think it wise to make sure that the order presented to Judge Ross makes it very clear that in the event Messano Construction does not make itself ready, willing and able to close title by such date, that under no event should the order compel your clients to convey title to DiFrancesco. I have learned through a reliable source that DiFrancesco has obtained mortgage financing of an amount sufficient to permit him to acquire title from your clients regardless whether Messano Construction closes title with him. Obviously, the game plan of Mr. Terrell [DiFrancesco's attorney] is to obtain title from your clients at any cost, again regardless whether Messano shows up.

The trial court on July 3, 1990, issued a written opinion holding that Butler and DiFrancesco were not guilty of fraud but that Baldasarre and Neumann were guilty of tortious interference with DiFrancesco's prospective economic advantage from the Messano contract. The court awarded compensa-

tory damages to DiFrancesco but denied his claim for punitive damages.

Plaintiffs appealed. The Appellate Division reversed the trial court judgment in almost every aspect. 254 *N.J.Super.* 502, 604 *A.*2d 112 (1992). The Appellate Division found that Butler had violated his ethical obligations as an attorney and that his failure to disclose the Messano contract to plaintiffs constituted equitable and legal fraud. The court found DiFrancesco vicariously liable for Butler's fraud because of the principal-agent relationship between DiFrancesco and Butler. Because plaintiffs had conveyed title to DiFrancesco on December 31, 1990, and he had installed improvements and sold the property, the remedy of rescission was by that time impossible. Therefore, the Appellate Division, accepting the trial court's finding that if plaintiffs had refused the extension, DiFrancesco would have waived the subdivision contingency and closed title immediately, awarded plaintiffs the original contract price, with interest from November 26, 1987, against defendants, jointly and severally. The court remanded the case for a hearing on plaintiffs' punitive damage claims. The Appellate Division also rejected the trial court's finding that the correspondence between plaintiffs and Messano established the requisite malice to sustain DiFrancesco's tortious interference counterclaim, and reversed the trial court's judgment against plaintiffs on that counterclaim.

Butler, his law firm, and DiFrancesco petitioned for certification, which we granted, 130 *N.J.* 10, 611 *A.*2d 649 (1992). Shortly, before oral argument, plaintiffs and Butler and the law firm settled the issues between them. Therefore, the only issues before this Court are plaintiffs' fraud claim against DiFrancesco and DiFrancesco's tortious interference with prospective economic advantage claim against plaintiffs.

## II

We first examine Baldasarre's and Neumann's fraud claim against DiFrancesco. Plaintiffs do not charge that DiFrances-

co personally perpetrated a fraud on them. Nor do the parties dispute that the terms of the initial contract were fair and reasonable and that Butler explained the terms of the contract to them. Rather, plaintiffs make the two-pronged argument that Butler acted fraudulently in not disclosing the Messano contract to plaintiffs when he obtained their approval for the October 1987 extension, and that DiFrancesco is liable as a principal for the fraud perpetrated by his agent, Butler.

The courts below reached directly opposite conclusions concerning whether Butler's conduct towards plaintiffs was fraudulent. We need not and do not decide whether Butler's nondisclosure constituted a fraud on plaintiffs. That claim has been settled between Butler and plaintiffs, and it need not be settled between plaintiffs and DiFrancesco because we find that even if Butler's nondisclosure did constitute fraud, DiFrancesco cannot be held vicariously liable. To address plaintiffs' vicarious liability argument, however, we will assume that Butler's failure to disclose the Messano contract to plaintiffs was tortious.

Plaintiffs' argument has a superficial appeal. Butler was DiFrancesco's agent. Generally, a principal is liable for the tortious acts of an agent acting within the scope of his or her authority. Therefore, it would appear to follow syllogistically that DiFrancesco is liable for the tortious acts of Butler. Indeed, that argument was adopted by the Appellate Division.

The problem with that argument, however, is that it oversimplifies the facts of the case and the governing principles. Butler was the dual agent of two principals, with each principal-agent relationship giving rise to its own set of duties. By failing to recognize the two separate agency relationships and their two separate sets of duties, plaintiffs and the Appellate Division have charged DiFrancesco with vicarious liability for Butler's act, which was tortious only within the context of his separate relationship with plaintiffs as *their* agent. Butler's duty to disclose the Messano contract to plaintiffs arose solely

because he was the agent and the attorney of the plaintiffs. Indeed, although Butler may have violated a duty to plaintiffs by his failure to disclose, if he had disclosed, he might have breached a duty to his other client, DiFrancesco.

> The agent ... is under no duty to disclose, and *has a duty not to disclose to one principal* confidential information given to him by the other, such as the price he is willing to pay.
>
> [*Restatement (Second) of Agency* § 392 comment b (1958) (emphasis added).]

It is undisputed that under the terms of the contract, DiFrancesco had every right to enter into a contract to sell the property once he obtained it, and no duty to inform plaintiffs of such a contract. DiFrancesco cannot be held vicariously liable for not disclosing the existence of the Messano contract when he himself had no duty to disclose it.

> In an action against a principal based on the conduct of a servant in the course of employment * * * the principal has a defense if * * * the agent did not fall below the duty of care owed by the principal to the third person."

[*Restatement (Second) of Agency* § 217 (1958).]

To the extent that Butler's nondisclosure was tortious, it was tortious because Butler breached obligations of his own that were beyond the scope of his agency relationship with DiFrancesco. Although Butler's act of remaining silent about the Messano contract was within the scope of his attorney-client relationship with DiFrancesco, that act derives its tortious character from Butler's separate duties to plaintiffs. Those duties were not part of the DiFrancesco–Butler principal-agent relationship, and therefore Butler's breach of those duties is not attributable to DiFrancesco. "[O]ne principal is not civilly liable to another for the tortious acts of an agent who acts for both parties with their consent, unless he in some manner participates in the wrong." 3 *Am.Jur.2d Agency* § 280 (1986).

The point is easily illustrated by imagining that Butler did not represent plaintiffs. If that had been the case, then Butler would have committed no tort by not disclosing the existence of the Messano contract to plaintiffs, because DiFrancesco had no duty, either directly or through his attorney, to

inform the sellers of an assignment. Unfortunately, Butler did represent both parties to the transaction, but DiFrancesco is not responsible for the conflicts generated by Butler's dual representation. It is the attorney's responsibility to avoid conflicts of interest, and if the attorney fails to do so, it is the attorney and not an innocent client who will be liable to any injured client.

■ Another problem with the theory adopted by the Appellate Division is that it fails to distinguish between those agency relationships that give rise to vicarious liability in the principal for the misconduct of the agent and those that do not.

> If the principal is the master of an agent who is his servant, the fault of the agent, if acting within the scope of his employment, will be imputed to the principal by reason of *respondeat superior*. But there is a vast difference between an employee agent and a non-employee agent. * * * [T]he non-employee agent is, generally, nothing else but an independent contractor. [*JMB Enter. v. Atlantic Employers Ins.*, 228 *N.J.Super.* 610, 617, 550 *A.*2d 764 (App.Div.1988).]

The important difference between an employee and an independent contractor is that one who hires an independent contractor

> has no right of control over the manner in which the work is to be done, it is to be regarded as the contractor's own enterprise, and he, rather than the employer is the proper party to be charged with the responsibility for preventing the risk, and administering and distributing it.
>
> [W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 71 (5th Ed.1984).]

Generally, therefore, the principal is not vicariously liable for the torts of the independent contractor if the principal did not direct or participate in them.

■■ The status of independent contractor is "characterized by the attributes of self-employment and self-determination in the economic and professional sense." *Rokos v. State, Dep't of Treasury*, 236 *N.J.Super.* 174, 181, 564 *A.*2d 1217 (App.Div. 1989). Those attributes are generally present in the attorney-client relationship. Attorneys generally are not subject to their clients' actual control or direction. Indeed, most clients have an attorney because they are unfamiliar with the law and want an attorney to guide them through the intricacies of that field. As

professionals, attorneys are deemed responsible for their own acts, and, as in this case, most clients have legal recourse against the attorney and his law firm for their actions. *See Feliberty v. Damon,* 72 *N.Y.*2d 112, 531 *N.Y.S.*2d 778, 781, 527 *N.E.*2d 261, 264 (1988) (treating attorney as independent contractor and holding client not vicariously liable); *Palmer v. Ted Stevens Honda, Inc.,* 193 *Cal.App.*3d 530, 238 *Cal.Rptr.* 363, 368 (1987) (stating that attorney is independent contractor); *but see Lynn v. Superior Court,* 180 *Cal.App.*3d 346, 225 *Cal. Rptr.* 427, 428 (1986) (reasoning that attorney is independent contractor in role as trial counsel but may be [employee] agent for business transactions); *contra Peterson v. Worthen Bank & Trust,* 296 *Ark.* 201, 753 *S.W.*2d 278 (1988) (applying traditional agency principles and finding client vicariously liable for attorney's torts within scope of employment); *Southwestern Bell Tel. v. Wilson,* 768 *S.W.*2d 755, 759 (Tex.App.1988) (same).

An examination of Butler's relationships with DiFrancesco and plaintiffs discloses that he was an independent contractor in his representation of both his clients. Therefore, in the absence of evidence that DiFrancesco had participated in or had authorized fraudulent conduct by Butler, he cannot be held liable for Butler's alleged fraudulent conduct. "[A] client is not responsible for any illegal action taken or directed by his attorney which the client did not advise, consent to, participate in, and which was not justified by any authority he had given." 7A *C.J.S. Attorney & Client* § 190 (1980).

An innocent client should not be held vicariously liable for the wrongful conduct of his or her attorney against the attorney's other clients if the client does not direct, advise, consent to or participate in the attorney's improper conduct. A dual agent's wrongful conduct should not be attributed to one innocent principal over the other. Furthermore, it would be unreasonable to hold a client vicariously liable for an act that would not be tortious had he committed it himself. Where the

client did no wrong, the injured client's recourse is, and properly should be, against the wrongdoing attorney.

### III

We turn now to DiFrancesco's claim that Baldasarre and Neumann intentionally interfered with his prospective economic advantage from the Messano contract. In order to succeed on this claim, DiFrancesco must show that he had a reasonable expectation of economic advantage arising from the Messano contract, and that this prospective advantage was lost as a result of the defendants' malicious interference with his pursuit of that advantage. "Malicious," in this circumstance, is defined to mean that "the harm was inflicted intentionally and without justification or excuse." *Printing Mart v. Sharp Elec.,* 116 *N.J.* 739, 751, 563 *A.*2d 31 (1989).

DiFrancesco asserts that the harm inflicted by plaintiffs was the intentional maintenance of their rescission suit. As long as that claim was pending, plaintiffs could not convey "good and marketable title" to DiFrancesco. DiFrancesco was therefore unable to satisfy his obligation, under the Messano contract, to provide "good and marketable title" within eighteen months of that contract's execution, and DiFrancesco lost the benefits of the Messano contract.

In support of his interference claim, DiFrancesco cites Santye's encouragement of plaintiffs to obtain new counsel, the initiation of the suit, plaintiffs' failure to comply with the trial court's September 19, 1988, order requiring them to convey good and marketable title, and correspondence between the attorneys for Messano, plaintiffs, and another potential assignee. DiFrancesco concludes that those facts indicate a conspiratorial attempt to cut DiFrancesco out of the deal so that plaintiffs could usurp his profit.

The trial court agreed and found that plaintiffs had attempted to cut DiFrancesco out of the deal and had engaged in a course of conduct they knew would result in the Messano

contract's expiration. Therefore, the trial court concluded plaintiffs' conduct was malicious.

In reversing, the Appellate Division concluded that DiFrancesco had failed as a matter of law to prove "malice." 254 *N.J.Super.* at 526, 604 *A.*2d 112. The Appellate Division ultimately concluded that plaintiffs were "motivated by their well-founded desire to protect their legitimate interests in seeking rescission rather than an intention to gain an economic advantage by undermining DiFrancesco's agreement with Messano." *Ibid.*

Regardless of which view we adopt of the correspondence between plaintiffs and Messano, we, like the Appellate Division, cannot conclude that plaintiffs acted without justification in bringing and refusing to dismiss their claim for rescission. First, we reject DiFrancesco's argument that the September 19, 1988, Order directing plaintiffs to convey the property implicitly ordered them to dismiss the rescission claim. The Order states as follows:

> ORDERED, that plaintiffs be and are hereby required to close and accept payment on their contract with the defendant, Paul M. DiFrancesco, Jr., on or before October 9, 1988 on the conditions set forth in the application.

The application, or Notice of Motion, sought

> an Order requiring plaintiffs to close and accept payment on their contract with the defendant, Paul M. DiFrancesco, Jr., on or before October 9, 1988 in order that defendant, Paul M. DiFrancesco, Jr., can close a contract with Messano Construction Company on condition that defendant, Paul M. DiFrancesco, Jr., will agree that following the completion of the closing of the Messano contract, he will hold in escrow the difference o[f] approximately $1,620,000 until this action is decided on the merits or concluded by the agreement of the parties.

DiFrancesco argues that "the conditions set forth in the application" that were incorporated by reference into the Order include the clause "in order that defendant, Paul M. DiFrancesco, Jr., can close a contract with Messano Construction Company * * *." DiFrancesco could close his contract with Messano only if plaintiffs conveyed marketable title. Therefore, DiFrancesco argues, the Order should be interpreted as requiring plaintiffs to convey marketable title. However, plaintiffs could

not convey marketable title unless they dismissed their rescission claim. DiFrancesco claims that plaintiffs were therefore obliged to dismiss the rescission claim in order to comply with the Order.

We find it much more probable that the Order, in referencing "the conditions set forth in the application," was referring to the clause in which DiFrancesco agreed to put the profits from the Messano contract in escrow until the action was concluded. That reading is all the more plausible because the Notice of Motion referred to the escrow provisions as a "condition," whereas the language pertaining to the Messano closing is not referred to as a condition and appears to function as a reason for the granting of the Order rather than a condition on it.

Even if our reading is incorrect and DiFrancesco's is correct, we cannot say that plaintiffs are guilty of malice for failing to accept and act in accordance with DiFrancesco's interpretation. In the absence of a clearer statement by the trial court requiring plaintiffs to dismiss the rescission claim, plaintiffs' refusal to do so cannot be construed as an intentional, unjustified, and unexcused interference with DiFrancesco's opportunities under the Messano contract. Although we have ultimately concluded, in light of a fully-developed factual record, that plaintiffs' claims against DiFrancesco are without merit, we do not consider them to have been frivolous. Given the uncertainty of both the relevant facts and law that existed at the time of the Order, plaintiffs could have believed in good faith that their claim for rescission was meritorious and could have refused to dismiss it on that sound basis. Therefore, a finding of malice based on their refusal to dismiss the rescission claim is unwarranted.

IV

This case graphically demonstrates the conflicts that arise when an attorney, even with both clients' consent, undertakes the representation of the buyer and the seller in a complex commercial real estate transaction. The disastrous

consequences of Butler's dual representation convinces us that a new bright-line rule prohibiting dual representation is necessary in commercial real estate transactions where large sums of money are at stake, where contracts contain complex contingencies, or where options are numerous. The potential for conflict in that type of complex real estate transaction is too great to permit even consensual dual representation of buyer and seller. Therefore, we hold that an attorney may not represent both the buyer and the seller in a complex commercial real estate transaction even if both give their informed consent.

## V

We hold that whatever Butler's liability to plaintiffs might be, it is not imputable to DiFrancesco. Therefore, we reverse the Appellate Division's award to plaintiffs of compensatory damages against DiFrancesco and its remand to the trial court for a further hearing on plaintiffs' punitive damage claim against DiFrancesco. We affirm the Appellate Division's dismissal of DiFrancesco's tortious interference with prospective economic advantage claim and his punitive damage claim against plaintiffs. Because DiFrancesco has not yet paid plaintiffs in full for the property, we order that he pay them the unpaid purchase price remaining on the sale of the property under the terms of the original contract, with interest from the date on which the conveyance occurred.

*For affirmance in part, for reversal in part*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.