701 A.2d 132

JULIA A. SCHAJER, PLAINTIFF, v. NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY, DEFENDANTS.

Superior Court of New Jersey
Law Division
Bergen County

Decided April 23, 1997.*

---

* This is an abridged version of the filed opinion.

*Albert L. Cohn (Cohn, Lifland, Pearlman, Herrman & Knopf)* for plaintiff.

*Harold Friedman (Stryker, Tams & Dill)* for defendant.

KOLE, J.A.D., Retired and Temporarily Assigned on Recall.

Julia Schajer (Julia or plaintiff) sues to recover total disability benefits under a disability policy issued by Northwestern Mutual Life Insurance Company (NML or defendant). NML defends, claiming that there is in fact no total disability; that plaintiff's claim is fraudulent; that she made fraudulent misstatements, material omissions of fact or concealments which bar her claim; and that the policy's incontestability and exclusionary provisions bar the claim. NML also counterclaims for benefits paid under a reservation of rights, as well as other sums claimed to be due it from plaintiff. Plaintiff further seeks compensatory and punitive damages from defendant for the latter's breach of duty of good faith and fair dealing, as well as its wanton, reckless and malicious wrongful acts.

This case is governed by New York law. On matters relating to the credibility of witnesses and other trial matters, New Jersey law may also apply.

After considering the credible proofs and reasonable inferences therefrom, including the demeanor of the witnesses, as well as the extensive arguments of counsel, I make the findings of fact and conclusions of law that follow.

## I. *Total Disability Under the Policy*

Plaintiff has the burden of establishing her claim for disability benefits by a preponderance of the credible evidence. She

must show that her claim is more likely true than not. *See Flexmir, Inc. v. Lindeman & Company,* 4 *N.J.* 509, 514, 73 *A.*2d 243 (1950); *Dalton v. Gesser,* 72 *N.J.Super.* 100, 111–112, 178 *A.*2d 64 (App.Div.1962); *see also Daniel v. Allstate Life Insurance Co.,* 71 *A.D.*2d 872, 419 *N.Y.S.*2d 662 (1979).

Despite defendant's argument that plaintiff's proofs are rife with contradiction, I am satisfied that plaintiff presented essentially trustworthy proofs in support of her claim. The claimed contradictions as to dates, including the date the total disability commenced, are understandable in light of an endeavor to recall events that occurred some eight years before trial. I do not find any intent to deceive as to such dates or as to any material matter testified to by Julia or her husband, Morris Schajer, or any of plaintiff's other witnesses, including Dr. Rafii. At best, the differences are the result of confusion and a reasonable failure of recollection. Indeed, Julia's testimony is corroborated in significant respects by the evidence of others, including defendant's witnesses.

In short, I find that the claimed discrepancies in testimony in no wise impugn the essential credibility of the evidence presented by plaintiff. *See De Rienzo v. Morristown Airport Corp.,* 28 *N.J.* 231, 239–240, 146 *A.*2d 127 (1958). *Cf. County of Middlesex v. Clearwater Village, Inc.,* 163 *N.J.Super.* 166, 174, 394 *A.*2d 390 (App.Div.1978); *State v. Fleckenstein,* 60 *N.J.Super.* 399, 408, 159 *A.*2d 411 (App.Div.), *certif. denied,* 33 *N.J.* 109, 162 *A.*2d 338 (1960).

■ In early 1987, Julia was a highly successful preferred stock trader-broker, earning in excess of $500,000 a year. In 1980, she was hired by Mabon Nugent to create a preferred stock department. By 1987, she was the head of her desk and a partner of the firm, with four or five people under her. Julia's business was extremely hectic and high pressured. She kept up with the fast pace, barely having enough time to use the restroom during the work day.

In early 1987, during a busy work day at Mabon Nugent, Julia was approached by Stephen Meszkat, an agent of defendant, NML. He had already sold several life insurance policies to Julia. He suggested that she buy a disability benefits insurance policy to insure her substantial income in case she should become disabled. She did so.

While Julia was in Vietnam visiting her soldier husband, in 1972, she contracted genital herpes (herpes simplex) from him, and had a single severe outbreak. She was treated at an Army hospital, and as far as she knew, she had been cured. Since then she had had no indication that she had genital herpes or any other venereal disease.

The NML disability income benefits insurance policy (the policy, which she acquired), was issued on March 4, 1987. The benefits for total disability were $15,000 per month. The premiums payable were substantial.

Sometime in April 1989, Julia began having recurrent genital herpes outbreaks. The pain of these outbreaks was excrutiatingly severe. It significantly interfered with her concentration and memory, two essential requirements of her position. The pain stemming from herpetic episodes made it impossible for her to function at her desk. It was totally debilitating. She had extreme difficulty sitting and concentrating on her business.

Upon experiencing these problems in April 1989, Julia sought medical treatment from her gynecologist, Dr. Joseph Finkelstein. Dr. Finkelstein prescribed a medication called zovirax, the generic name of which is acyclovir. Julia suffered unfortunate side effects from this medication: dizziness, drowsiness, irritability, muscle aches in her lower back and shoulder, persistent sore throat and severe nausea. Dr. Finkelstein finally advised her not to take it.

In July, 1989, Julia left work, crying, and made an unannounced visit to Dr. Finkelstein in order to secure relief from her pain. Nothing that she tried could make the pain stop. Finally, in an effort to relieve her pain and after consultation with Dr. Finkel-

stein, she saw a plastic surgeon, Dr. Robert Jetter, who removed a portion of her labia in August 1989.

The surgery succeeded in alleviating the pain for six months. Julia continued to work at her job. Unfortunately, by early 1990, she again began to experience recurring and unrelenting episodes of herpes simplex. These same episodes continue to date. For the remainder of 1990, until October 14, 1990, Julia functioned as best she could at her high stress job.

Hoping that a short leave of absence would help her condition, she left her job at Mabon Nugent on October 14, 1990. Unfortunately, her condition never improved. At the insistence of Mabon Nugent, since she gave no indication of returning, she finally resigned from her position in April 1991, and never returned. She cannot perform in the profession that she loved and in which she was so well compensated, because she cannot think, cannot concentrate and cannot work steadily as is required of a successful preferred stock broker. Despite her disability, Julia did attempt to earn a living after she left Mabon Nugent. However, her condition prevented her from working.

Her claim under the policy was filed with NML in December 1990.

Julia suffers from chronic genital herpes simplex resulting from a virus infection. It is a permanent and incurable condition, although it may go into remission for periods of time. The herpes simplex virus lives in the nerves and travels along the nerves causing pain. The severe nerve pain, "causalgia," suffered by Julia is a burning pain caused by the virus located in the nerve or its cell. The effect of the pain on Julia is so severe that she can only concentrate on the pain and very little else, and thus, is unable to concentrate on and handle her stressful job as stock broker while such pain exists. The stress inherent in her work

worsens the pain from the herpes.[1]

Although patients severely disabled by vaginal herpes simplex are rare and zovirax is rarely not tolerated by them, the credible evidence establishes that Julia is an unusual case in both respects. She is unable to tolerate the drug's side effects. Hers may or may not be a unique or idiosyncratic case in both areas, but the unusual nature of her extreme disability and reaction to the medication does not mean that she was not so adversely affected and totally disabled. After all, it is the individual insured, not the reasonable person, whose condition is involved in a disability benefits insurance claim. *See Nickolopulos v. The Equitable, U.S.,* 113 *N.J.L.* 450, 454, 174 *A.* 759 (E. & A.1934), citing the New York case of *Ursaner v. Metropolitan Life Insurance Co.,* 146 *Misc.* 121, [262 *N.Y.S.* 462 (N.Y.Sup.Ct.1933) ]. *See also Fannick v. Metropolitan Life Ins. Co.,* 34 *N.J.Super.* 556, 564, 113 *A.*2d 28 (App.Div.1955).

There was ample corroborative testimony at trial demonstrating Julia's inability to function as a preferred stock broker. [The *court's discussion of most of the testimony is omitted*].

Several doctors, including her gynecologist, Dr. Joseph Finkelstein, testifying for Julia, supported her claim that she is disabled as a result of her genital herpes.

Support for the existence of Julia's disability from herpes simplex, including her pain and inability to work at her stockbroker's job as a result thereof, is also to be found in defendant's evidence and documents. [The court's discussion of such evidence is omitted].

The subjective nature of pain alone does not in any wise militate against its existence here. As to "pain credibility," the Second Circuit Court of Appeals, in a case involving disability benefits under the Social Security Act, has held that pain itself may be so

---

[1] The inherently stressful nature of a stockbroker's job has been judicially recognized for social security disability purposes. *Jarosz v. Sullivan,* 1991 *WL* 81935 (E.D.N.Y.1991).

great as to merit a conclusion of disability where a medically ascertained impairment (such as, here, vaginal herpes) is found, even if the pain itself is not corroborated by objective medical findings. Claims of disability pain must be determined in the light of all the evidence regarding the extent of the pain. *Rivera v. Schweiker,* 717 *F.*2d 719, 724–725 (2d Cir.1983); *Marcus v. Califano,* 615 *F.*2d 23, 28 (2d Cir.1979).

The credible evidence, including that which was produced by defendant, supports the conclusion as to Julia's substantial degree of pain and that she was and is totally disabled from performing the principal duties of her occupation of preferred stock broker. All of the physicians agree that herpes is incurable and permanent. There is no credible evidence adduced by defendant that this condition will end any time soon, if at all.

■ NML contends that plaintiff's refusal to take zovirax or other presently available drugs (valtrex and famvir) should militate against finding her totally disabled. Plaintiff's physician eventually advised Julia not to take zovirax (the generic name of which is acyclovir), because of the side effects. Apart from defendant's expert witness, the medical testimony reasonably supports the conclusion that Julia should not take zovirax, valtrex or famvir.

A disability will not be considered total if there is available plainly effective treatment that would relieve the disability and pose no danger to the insured's life or health. As to whether or not the treatment is effective in this respect, however, is a matter of fact for determination by the fact finder. *See Papas v. Equitable Life Assur. Soc.,* 265 *A.D.* 128, 37 *N.Y.S.*2d 811, 813 (1942); *Peasley v. Wendling Iron Works,* 277 *A.D.* 622, 102 *N.Y.S.*2d 219, 220 (1951) (worker's compensation). Unjustified fear of the medications or remedial procedure alone is no ground for the insured's refusal to take any such drug or undergo such procedure. *Palloni v. Brooklyn–Manhattan Transit Corp.,* 215 *A.D.* 634, 214 *N.Y.S.* 430 (1926); *Peasley, supra,* 102 *N.Y.S.*2d at 220.

The use of zovirax has not restored plaintiff to a state where she can perform her job. The credible evidence supports the conclusion that zovirax is generally effective in the treatment of herpes with no serious side effects. But NML's expert, Dr. Berman also testified that different people react differently to this medication. The only relevant question is whether or not Julia falls within that small minority who experience side effects. *See Nickolopulos v. The Equitable, U.S., supra,* 113 *N.J.L.* at 454, 174 *A.* 759 (E. & A.1934). She does. Even were this court to find that zovirax effectively inhibited plaintiff's symptoms from herpes, zovirax, with its attendant side effects, significantly interfered with Julia's ability to concentrate on the task of trading preferred stocks.

Moreover, there is credible evidence to show that other drugs offered plaintiff by NML's expert would have produced the same side effects. The PDR on valtrex confirms that "VALTREX is contraindicated in patients with known hypersensitivity or intolerance to ... acyclovir, or any component of the formulation." The product information also notes the existence of nausea, headaches, dizziness and other adverse reactions to valtrex in clinical trials.

Julia's refusal to take any of the three medications, thus, was entirely reasonable. Under these circumstances, plaintiff is under no obligation to use any of the three mentioned drugs in order to qualify as totally disabled.

It is evident from the foregoing that Julia has proven by a preponderance of evidence that by October 14, 1990, she was totally disabled within the terms of the policy (sec. 1.2) and was entitled to full benefits thereunder. In the words of the policy she was "unable to perform the principal duties of [her] occupation" as preferred stock broker during the Initial Period of 60 months of benefits (until May 1996). After that Initial Period, she was totally disabled, since she was still unable to perform the principal duties of her occupation; and additionally, she "was not gainfully employed in any occupation." There is no doubt factually that she was not so gainfully employed after May 1996. NML appears to argue that this provision requires her to seek out any reasonable

gainful employment, even if outside the area of her occupation; otherwise, it asserts, she is not totally disabled. But there is no such requirement in the policy. It speaks only of being actually gainfully employed in any occupation. In any event, the evidence supports the fact that Julia is unable to engage in any significant other remunerative occupation or employment.

Defendant contends that, even if Julia were found to be disabled—a finding that would have to ignore her refusal even to try medication—her claim for benefits is excluded under the policy, since her disability commenced in February 1988, not in April 1989, within the contestability and exclusionary provisions of the policy. It contends that the testimony of Julia and Morris were part of Julia's creative and crafty design to move the disability events outside the two-year period of the incontestability clause—that is, after March 17, 1989, in order fraudulently to receive benefits under the policy to which she is not entitled. They did this by manipulating dates from 1988 to 1989.

Defendant's position essentially is that Julia has submitted and is seeking recovery on a fraudulent claim. As in any case of fraud, the evidence thereof must be clear and convincing, a standard that defendant has not met. *See Baldasarre v. Butler,* 254 *N.J.Super.* 502, 521, 604 *A.*2d 112 (App.Div.1992), *aff'd* and *rev'd in part on other grounds,* 132 *N.J.* 278, 625 *A.*2d 458 (1993); *see also Simcuski v. Saeli,* 44 *N.Y.*2d 442, 406 *N.Y.S.*2d 259, 377 *N.E.*2d 713 (Ct.App.1978).

Defendant's contentions do raise suspicions. But they do not go beyond that. The court is not persuaded that, even in the aggregate, they adversely affect the credibility of plaintiff's proofs or demonstrate any material credibility problem therein.

Section 4.3 of the policy requires written proof of disability to be given to NML within 90 days after the end of each monthly period for which benefits are claimed. As noted, New York law requires the insured to take remedial medication if it would be effective in treating her condition or symptoms without causing her harmful side effects. The court has held that no medication is presently

available for the treatment of Julia's herpes that is both effective in allowing her to return to work and not adversely affecting her health.

The evidence shows that there is on-going research in the area of medication for the alleviation of herpes and its symptoms. Conceivably, therefore, a medication may be made available which is both effective and unlikely to have the intolerable side effects of the existing three medications. If that event occurs, it may well be that NML will endeavor to have Julia use such new medication.

In that event, if there is a genuine dispute between Julia and NML as to whether she should take the new medication, and Dr. Finkelstein recommends against her taking it, the court suggests the issue be resolved by a procedure similar to that discussed in *Heller v. Equitable Life Assur. Soc. of U.S.*, 833 *F*.2d 1253, 1260 n. 15 (7th Cir.1987). In the present case, following that procedure would require both the insured and insurer to select their own board-certified specialists, with a third panelist to be chosen by the Dean of a New York medical school. The panel would make a binding decision regarding the extent of the disability, as well as whether the new medication should be taken. In the instant case, one or more of the specialists may well be board-certified pharmacologists.

The court is not requiring any such procedure or even suggesting that NML seek to have Julia take any new medication under section 4.3 of the policy.

In view of the foregoing, Julia is entitled to total disability benefits under the policy, provided such benefits are not barred by the incontestability and exclusionary clauses of the policy.

## II.

### *The Incontestability and Exclusion Policy Provisions*

The applicable New York statutes (N.Y. Life and Health Insurance Law, Section 3216(d)(1)(B)(i) and (ii)), dealing with incontestability clauses, provide that the policy must contain a provision

that after two years from the date of issue of the policy, no misstatements, except fraudulent misstatements, made by the applicant in the application for the policy, shall be used to void the policy or to deny a claim for loss or disability (as defined in the policy) commencing after the expiration of such two-year period. However, the policy may contain, in lieu of this incontestability provision, the following provision: "... from which the clause in parentheses may be omitted at the insurer's option":

After this policy has been in force for a period of two years during the lifetime of the insured (excluding any period during which the insured is disabled), it shall become incontestable as to the statements contained in the application.

[Sec. (B)(i).]

The statute requires that the following provision be in the policy:

No claim for loss incurred or disability (as defined in the policy) commencing after two years from the date of issue of this policy shall be reduced or denied on the ground that a disease or physical condition not excluded from coverage by name or specific description effective on the date of loss had existed prior to the effective date of coverage of this policy.

[Sec. (B)(ii).]

The statute also permits the insurer, at its option, to substitute for one or more of the required provisions, corresponding provisions of different wording approved by the superintendent which are not less favorable in any respect to the insured. (First unnumbered paragraph of Section 3216(d)).

Justice O'Hern, in his dissent in *Paul Revere Life Ins. Co. v. Haas,* 137 *N.J.* 190, 211–214, 644 *A.*2d 1098 (1994), indicated that New York pointed the way to the adoption of the notion of an incontestability clause in an insurance policy. Its action in this respect resulted in a model statutory incontestability provision adopted by the legislatures of various states, including New York and New Jersey. The purpose was to meet widespread charges of corruption, fraud, and dishonesty in the insurance industry. Additionally, such clause provides definiteness and certainty and the resulting peace of mind for the beneficiaries of the policy. *See Killian v. Metropolitan Life Ins. Co.,* 251 *N.Y.* 44, 166 *N.E.* 798, 800 (Ct.App.1929). It is designed, at the same time, to provide

ample time for the carrier to investigate fraud and other defenses. *Berkshire Life Ins. Co. v. Weinig,* 290 *N.Y.* 6, 47 *N.E.*2d 418, 421 (Ct.App.1943).

The legislatures gave insurance companies the option of choosing a clause denying coverage at any time after issuance of the policy when the insured has made fraudulent misstatements in the application. They also had the option to use a provision barring, after two years, any contest over policy statements but tolling the running of the two-year contestability period for any period during which the insured was disabled. NML chose neither of these two options. Instead, it appears to have chosen the second option, without the tolling provision for disability during the two-year contestability period.

The policy's incontestability clause provides:

7.2 Incontestability

In issuing this policy, the Company has relied on the application. The Company may rescind the policy or deny a claim due to a misstatement in the application. However, after this policy has been in force for two years from the Date of Issue, no misstatement in the application may be used to rescind the policy or to deny a claim for a disability or loss that starts after the two year period.

In addition, a claim may be denied on the basis that a disability or loss is caused by a Pre–Existing Condition (see Section 2.1). However, the Company may not reduce or deny a claim on that basis if the disability or loss:

- starts after two years from the Date of Issue; and

- is not excluded from coverage by an Agreement for Limitation of Coverage.

NML's incontestability clause is its own and it is, of course, bound thereby. It was presumably chosen for marketing reasons. *See Paul Revere Life Ins. Co. v. Haas, supra,* dissent, 137 *N.J.* at 213, 644 *A.*2d 1098.

There is thus no exception to the incontestability clause available to NML for fraudulent misstatements in the application. *See Monarch Life Ins. Co. v. Brown,* 125 *A.D.*2d 75, 512 *N.Y.S.*2d 99, 102 (1987). Accordingly, the incontestability provision adopted by NML applies equally to unintentional and fraudulent misstatements in the insured's application.

NML gave plaintiff the reasonable expectation that the incontestability clause in its policy did not apply to fraudulent misstatements. It also did not include a provision that the period of contestability would be increased by the length of the period of a disability beginning within two years from the date of issue—the so-called "tolling" provision. To hold that, nevertheless, the tolling provision applies, contravenes the statutory policy against permitting provisions less favorable in any respect to the insured.

Lastly, the policy itself says:

[a]ny provisions of this policy, which, on the Date of Issue, are in conflict with the statutes of the state in which the Owner resides on that Date are amended to conform to such statutes.

[Sec. 7.5]

This provision must be read in conjunction with the remaining mandatory language of section (B)(ii) of the statute, already recited.

There are two issues to be examined with regard to this section (B)(ii). The first, is the meaning of the term "existed" in New York; the second, is the interpretation of an exclusionary clause that affects an incontestability clause.

As for the first, the meaning of "existed" in New York is quite clear:

[t]he proper interpretation of the incontestability clause is to deny benefits when disability caused by preexisting illness occurs within the two-year contestability period and to allow recovery when such disability occurs more than two years from the inception of the policy.

[*Monarch Life Ins. Co. v. Brown*, 125 A.D.2d 75, 512 N.Y.S.2d 99, 103 (App.Div. 1987); *see White v. Mass. Cas. Ins. Co.*, 96 A.D.2d 732, 465 N.Y.S.2d 345, 346 (App.Div.1983).]

This is the law of New York that applies with an iron hand, regardless of whether the insured fraudulently hid a premanifested illness from her insurance company.

New York rejects the majority rule's "manifesting-existing" distinction in favor of the clear-cut rule that if two years pass from the date of issue without a disabling disease, the insurer cannot later deny coverage for a disability by claiming the insured

concealed a disabling disease which had manifested itself prior to the policy's effective date. *Monarch Life Ins. Co., supra,* 512 *N.Y.S.*2d at 103; *White, supra,* 465 *N.Y.S.*2d at 346. "The statutory scheme gives the insurer two years to conduct an investigation of facts relevant to determining its risks; having failed to investigate, the insurer cannot be heard to complain now." *White, supra,* 465 *N.Y.S.*2d at 346.

Defendant thus cannot deny plaintiff coverage on the ground that she lied on her application as to the existence or manifestation of genital herpes, since the policy has been in force for over two years.

There remains the second issue, which involves harmonizing the exclusionary clause in the contract here with the statutory incontestability clause. The policy provides:

SECTION 2. EXCLUSIONS

2.1 PRE-EXISTING CONDITIONS

There will be no benefits for a disability or loss that:

 —starts within two years after the Date of Issue; and

 —results from an accident that occurred or from a sickness that *appeared* within two years before the Date of Issue and was not disclosed in the application.

A sickness is considered to have appeared or an accident to have occurred if it would have caused a prudent person to seek medical attention.

[Sec. 2.1 (emphasis added).]

The exclusionary clause thus purports to exclude from coverage any disability resulting from a "sickness" that "appeared" two years *before* the date the policy was issued (March 4, 1987), which plaintiff did not disclose in her application, *and* an actual "disability" which starts or commences *within* two years *after* the date the policy was issued.

The challenge in giving meaning to this clause arises from the portion of section (B)(ii) of the incontestability statute, which is reflected in sec. 7.2 of the policy. As indicated, that statutory provision states:

No claim for loss incurred or disability (as defined in the policy) commencing *after* two years from the date of issue of this policy shall be reduced or denied on the ground that a disease or physical condition *not excluded from coverage by name or*

*specific description* effective on the date of loss had existed prior to the effective date of this policy.

[*N.Y. Life and Health Insurance Law* § 3216(d)(1)(B)(ii) (emphasis added).]

Since the court finds that the disability here commenced after two years from the date of issue, and the exclusionary clause does not exclude genital herpes from coverage "by name or specific description," under New York law, the exclusionary clause and the incontestability clause do not apply. *Monarch Life Ins. Co., supra,* 512 *N.Y.S.*2d at 103.

NML cannot deny coverage to Julia based on either her allegedly fraudulent misstatements in connection with her policy or the herpes episode which pre-existed the date of issue of the policy; for more than two years had passed from the date of issue when her disability, as defined under the policy, commenced.

Julia had only minor symptoms of her herpes disease within the two-year contestability period—in February 1988—which did not interfere with her performance of the principal duties of her occupation. The herpes had not then risen to the level of being deemed a "total disability" or the commencement of a total disability, within the meaning of the policy. The court has found that Julia's condition became such a disability between April 1989, and October 1990, when she went on leave of absence, a time period falling outside the two-year contestability period, which began on March 4, 1987 (the date of issue), and ended March 4, 1989.

Section 7.2 of the policy and the statute plainly provide that disabilities occurring more than two years after the date of issue of the policy are incontestable. As discussed, section 1.2 of the policy defines "disability" in terms of the insured's inability to work; "total disability" is defined as occurring when the insured "is unable to perform the principal duties of his occupation." Julia became totally disabled under this definition when she was compelled to stop working for Mabon Nugent in October 1990; and, as discussed, that disability commenced more than two years after the March 4, 1987 date of issue of the policy. Thus, NML may not

avoid coverage based on a pre-existing condition or exclusion by reason thereof. *White v. Massachusetts Casualty Insurance Co.*, 96 *A.D.*2d 732, 465 *N.Y.S.*2d 345, 346 (1983), *appeal withdrawn,* 70 *N.Y.*2d 694, 518 *N.Y.S.*2d 1032, 512 *N.E.*2d 558 (1987).

Moreover, the incontestability clause would bar NML's defense even if the court determined that Julia became disabled *within* two years after the policy was issued, since NML did not contest coverage of the policy within such two-year period. *Berkshire Life Ins. Co. v. Weinig,* 290 *N.Y.* 6, 47 *N.E.*2d 418 (1943); *see also Killian v. Metropolitan Life Ins. Co.,* 251 *N.Y.* 44, 166 *N.E.* 798 (1929). By failing to assert the defenses to policy coverage within two years after the issuance of the policy, NML is precluded from raising those defenses now, regardless of when Julia's disability arose.

In New York an incontestability clause is in the nature of, and serves a similar purpose as, a statute of limitations. *Berkshire Life Ins. Co. v. Fernandez,* 124 *A.D.*2d 120, 511 *N.Y.S.*2d 348, 350 (1987), *aff'd,* 71 *N.Y.*2d 874, 527 *N.Y.S.*2d 751, 522 *N.E.*2d 1049 (1988).

In the present case, the exclusionary defenses were not asserted before the commencement of this action by Julia in 1992. NML's answer was filed in October 1992.

> A contest ... begins when the insurer avoids, or seeks to avoid, the obligation of the contract by action or defense. If the insured or the beneficiary is plaintiff, suing to declare the policy in force or to recover money due, the contest takes its start when the insurer serves an answer disclaiming liabilities.
>
> [*Killian, supra,* 166 *N.E.* at 800.]

Because NML asserted its exclusionary defenses more than five years after the date of issue of the policy, it failed to contest liability within the prescribed period.

Even if the exclusionary clause were applicable here, NML has not sustained its burden of proving that Julia is barred from relief by reason thereof. Such a clause must be strictly interpreted and must apply in clear and unmistakable language. *Monarch, supra,* 512 *N.Y.S.*2d at 103. The insurer bears the

burden of proving that the claim is solely and entirely within the exclusion. · *Technicon Elec. Corp. v. American Home Assur. Co.,* 74 *N.Y.*2d 66, 544 *N.Y.S.*2d 531, 542 *N.E.*2d 1048 (Ct.App.1989), *reargument denied,* 74 *N.Y.*2d 893, 547 *N.Y.S.*2d 851, 547 *N.E.*2d 105 (1989). *See United Rental Equip. Co. v. Aetna Life & Cas. Ins. Co.,* 74 *N.J.* 92, 99, 376 *A.*2d 1183 (1977).

▆▆ NML has failed to prove that Julia's disability "results ... from a sickness that appeared *within two years before* the Date of Issue and was not disclosed in the application." (emphasis supplied). NML has failed to prove that Julia had a recurrence of herpes within two years *prior* to the date of issue of the policy— March 4, 1987.

The earliest date that Julia experienced a recurrence of genital herpes is February 1988, the date that Dr. Finkelstein's records indicate that she sought medical attention for that condition. Since February 1988, is after the date of issue of the policy, Julia's sickness would not have "appeared within two years before the Date of Issue."

Nor has NML sustained its burden of proving a disability or loss that "starts within two years after the Date of Issue." Julia's disability in or after April 1989, caused her to leave her job on October 14, 1990. It was on October 14, 1990, that she no longer was able to perform the duties of her occupation. In fact, the commencement of the disability causing her total disability, as defined in the policy, truly started in early 1990, when her labial surgery no longer was effective to prevent recurrence of severe vaginal herpes and pain; but in no event did it start prior to April 1989.

Julia worked at Mabon Nugent until October 14, 1990. Since then she neither has been able to perform the principal duties of her occupation nor has she been gainfully employed. The definition of disability (sec. 1.2 of policy) is couched exclusively in terms of the impact of the underlying condition upon the insured's ability to work and, after the initial period, not being gainfully employed

in any occupation. Thus, the incontestability and exclusion clauses do not bar Julia from benefits under the policy.

## III

### Plaintiff's Claim for Damages and Counsel Fees

In addition to benefits under the policy, plaintiff seeks compensatory and punitive damages from NML, predicated on its alleged bad faith in dealing with plaintiff's claim.

██ There is no factual basis for an award of any such damages. The total disability claimed was unusual, and was the first genital herpes total disability that NML had ever had. Additionally, Julia's gynecologist, Dr. Finkelstein, had suggested that NML interview her employer to determine whether in fact she was disabled from working. NML acted in an entirely reasonable fashion in investigating the claim before making payments and deciding to make only accommodation payments until that kind of disability had been established to its reasonable satisfaction or by a court.

Under these circumstances, the imposition of compensatory or punitive damages on NML is plainly not warranted. *See Royal Globe Ins. v. Chock Full O'Nuts Corp.*, 86 *A.D.*2d 315, 449 *N.Y.S.*2d 740, 743, 744 (1982). In that case, the court stated that there was no analogy between allowing damages in excess of policy limits when the damages stem from the insurer's bad faith refusal to settle a liability claim made by a third party, and termination of benefits under a disability policy, "for there is no possibility of the insured being cast in damages which exceed policy limits by reason of the insurer's conduct." *Id.* 449 *N.Y.S.*2d at 743 (citing *Halpin v. Prudential Ins. Co.*, 48 *N.Y.*2d 906, 425 *N.Y.S.*2d 48, 401 *N.E.*2d 171 (Ct.App.1979)).

There is no evidence of gross, wanton or willful fraud or other morally culpable conduct justifying punitive damages. *Royal Globe, supra*, at 744; *see also Rocanova v. Equitable Life Assurance Society of the United States*, 83 *N.Y.*2d 603, 612 *N.Y.S.*2d

339, 634 *N.E.*2d 940 (Ct.App.1994); *Gordon v. Nationwide Mutual Ins. Co.,* 30 *N.Y.*2d 427, 334 *N.Y.S.*2d 601, 608–609, 285 *N.E.*2d 849 (Ct.App.1972).

The result would be the same if New Jersey law were applied. *See Rova Farms Resort v. Investors Ins. Co.,* 65 *N.J.* 474, 323 *A.*2d 495 (1974); *Herman v. Sunshine Chemical Specialties, Inc.,* 133 *N.J.* 329, 337–338, 627 *A.*2d 1081 (1993).

■ Moreover, there is no legal basis for an award of counsel fees in this action by the insured against the carrier to enforce disability benefits. Such fees are recoverable in New York only when the claiming insured has been cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations, such as by a declaratory judgment action. *Royal Globe, supra,* 449 *N.Y.S.*2d at 745 (citing the Court of Appeals opinion in *Mighty Midgets v. Centennial Insurance Co.,* 47 *N.Y.*2d 12, 416 *N.Y.S.*2d 559, 389 *N.E.*2d 1080 (Ct.App.1979)). This bar applies as well to legal expenses, but not to taxed costs. *Doyle v. Allstate Ins. Co.,* 1 *N.Y.*2d 439, 154 *N.Y.S.*2d 10, 14, 136 *N.E.*2d 484 (Ct.App.1956).

■ Plaintiff is also not entitled, under New Jersey law, to counsel fees and legal expenses in this action to recover on a first party policy—here, a direct coverage disability benefits policy. *Kistler v. N.J. Manufacturers Ins. Co.,* 172 *N.J.Super.* 324, 411 *A.*2d 1175 (App.Div.1980); *Vesley v. Cambridge Mut. Fire Ins. Co.,* 189 *N.J.Super.* 521, 461 *A.*2d 162 (App.Div.1981), *aff'd* by an equally divided court, 93 *N.J.* 323, 460 *A.*2d 1057 (1983). She may, however, recover taxed costs. *R.* 4:42–8(a).

## Conclusion

Judgment will be entered in favor of plaintiff and against defendant (1) for total disability benefits under the policy; and (2) dismissing defendant's counterclaim with prejudice. Judgment will be entered in favor of defendant and against plaintiff with

respect to plaintiff's claim for compensatory and punitive damages, as well as counsel fees and legal expenses, except taxed costs.

Taxed costs will be allowed to plaintiff. *See N.J.S.A.* 22A:2–8; *R.* 4:42–8(a); *Doyle v. Allstate Ins. Co., supra,* 154 *N.Y.S.*2d at 14, 136 *N.E.*2d at 487; *Finch, Pruyn & Co., Inc. v. Martinelli,* 108 *N.J.Super.* 156, 260 *A.*2d 259 (Ch.Div.1969); *A.J. Tenwood A. v. Orange Sr. Cit. Housing,* 200 *N.J.Super.* 515, 491 *A.*2d 1280 (App.Div.1985); *Davila v. Continental Can Co.,* 205 *N.J.Super.* 205, 500 *A.*2d 721 (App.Div.1985).